FIFTH DIVISION

No. 1-06-3072

| | | |
|---|---|---|
| GARCIA CLARKE, as Executor of the Estate of George Clarke, Jr., Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | No. 03 L 6457 |
| v. | ) ) | |
| MEDLEY MOVING AND STORAGE, INC., and GREGORY GRIFFIN, | ) ) ) | Honorable John B. Grogan, Judge Presiding. |
| Defendants-Appellants. | ) | |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

After a jury trial, defendants Medley Moving and Storage, Inc. (Medley), and Gregory Griffin were found liable in the survival claim for the pain and suffering George Clarke, Jr. (Clarke), endured prior to his death and the wrongful death claim for his four surviving children. On appeal, defendants contend: (1) the trial court erred in denying their motion for judgment notwithstanding the verdict on damages for loss of past and future gifts, benefits, goods and services; (2) the trial court erred in denying their motion for judgment notwithstanding the verdict on damages for pain and suffering; (3) the trial court erred by not including the modifier *conscious* in the jury instruction for compensation for pain and suffering; (4) the trial court erred in denying a new trial due to plaintiff's comments during closing argument concerning the special interrogatory; (5) the cumulative effect of allegedly prejudicial comments by plaintiff's counsel during closing argument deprived defendants of a fair trial; and (6) that remittitur should be

entered because the record does not support the significant amounts awarded by the jury. For the reasons that follow, we affirm the judgment of the circuit court.

BACKGROUND

In May 2002, 83-year-old Clarke was crossing the street when he was struck by a truck driven by defendant Griffin and owned by defendant Medley. Clarke died of his injuries shortly after he was transported to a hospital. In 2003, plaintiff Garcia Clarke, individually and as independent executor of the estate of Clarke, sued defendants, alleging damages sustained by Clarke's estate under the Illinois Wrongful Death Act (740 ILCS 180/0.01 (West 2002)) and Survival Act (755 ILCS 5/27-6 (West 2002)).

At trial, the witnesses' testimony established that the pedestrian-vehicle collision occurred at the intersection of Michigan Avenue and 95th Street in Chicago, Illinois. Griffin had driven the Medley 26-foot moving van west on 95th Street and was waiting in the left-turning lane to continue south on Michigan Avenue. Griffin turned left when his traffic signal was yellow and was driving south on Michigan Avenue when his van struck Clarke, who was crossing Michigan Avenue.

Defendant Griffin testified that he was driving the van and accompanied by Medley employee George Thornton at the time of the collision. Griffin had an unobstructed view of the southwest corner of the intersection in question, and he did not see Clarke on the corner or in the street when Griffin was making his left turn. Griffin did not see Clarke until a second before the collision. According to Griffin, at the time of the impact with Clarke, the nose of Griffin's truck was south of the crosswalk, and the truck was heading straight southbound. Griffin applied his

brakes, but did not have time to slow his truck or maneuver around Clarke. Griffin testified that Clarke was outside the crosswalk when he was struck.

Denise Watkins testified that she witnessed the collision while she was in her vehicle on Michigan Avenue and facing north. She was stopped at the traffic light and in the first vehicle in the left-hand turning lane, waiting to turn left onto 95th Street and proceed west. She saw Clarke walking east inside the crosswalk, from Watkins' left to her right. He was crossing with the green light or the "walk man." Clarke was walking very slowly but started to run across the road when he saw the light change. At the time of the collision, Watkins was involved in a conversation with her passengers. When Griffin's van struck Clarke, Watkins exited her vehicle to tend to Clarke. His eyes were open and moving to the right and left. He looked directly at Watkins and moved his lips to ask for help but made no sound. Clarke's body was shaking and his chest was moving very fast, as though he was having difficulty breathing. Watkins estimated that she was at the scene for 10 or 15 minutes. An ambulance arrived at the scene, and the police followed. Watkins did not identify herself to the paramedics or the police. No police officer spoke to Watkins except to ask her to move her vehicle.

Fredella Robertson testified that she saw the collision from the front seat of Watkins' vehicle. Robertson corroborated Watkins' testimony, adding that she (Robertson) exited the vehicle and stood over Clarke while Watkins knelt beside him. Robertson also thought that Clarke was attempting to speak but she could not determine what he was trying to say. He was bleeding, gasping for air, and blood was running out of his mouth. Both Robertson and Watkins thought Clarke would expire at the scene.

Chicago police officer Derrick Jerry testified that Clarke was transported to the hospital before he (Officer Jerry) arrived at the scene. It was his normal procedure to speak with anyone at the scene who may have tended to the injured person, but he did not recall any people identifying themselves as witnesses.

John Merlotti, M.D., a trauma surgeon, testified that he treated Clarke at the hospital. Clarke was a level one trauma patient, coming to the emergency room as a significantly injured victim. He could not communicate upon arrival. He had suffered a scalp laceration with blood oozing from his ears and nose, which was clinical evidence of a basilar skull fracture. A chest X-ray revealed a large hemothorax. Paramedics gave a history of "diminished level of consciousness" at the scene of the accident.

Dr. Merlotti testified that, upon arrival at the emergency room, Clarke's Glasgow coma score was three. That scoring system was used to characterize the level of consciousness of a patient with a head injury, and the scores ranged from 3 to 15. Clarke was not alert or awake. He exhibited no eye opening or verbal response, had no motor function, made no sounds, and did not withdraw from pain. Dr. Merlotti stated that although a Glasgow coma score of three did not mean there was no pain or suffering, a score that low so soon after the injury indicated that pain and suffering were unlikely. He explained that open eyes, without more, were an insufficient basis to reach an opinion about consciousness. Dr. Merlotti opined that, assuming the accuracy of Watkins' observations that Clarke was actually moving and verbalizing words, there potentially was a time period of pain and suffering. Dr. Merlotti, however, confirmed that there was no evidence Clarke was conscious from the time the paramedics arrived at the scene until the time of

Clarke's death. Dr. Merlotti testified that the injuries Clarke sustained, including rib fractures, an open front right ankle fracture, scalp laceration, basilar skull fractures, and hemothorax, would cause pain to a conscious person. Although Clarke had outlived the average life expectancy according to the life table statistics, a person's life expectancy gets longer as he ages, and Clarke had no evidence of any life-threatening injury or illness aside from the trauma he sustained.

Three of Clarke's four adult children testified regarding the relationship they had with their father and their personal losses resulting from his death. All three children testified that their father gave them an occasional gift when appropriate but did not give them money on a regular basis. They stated that their father was healthy, active and of sound mind before his death. They described how he gave them guidance and taught them patience and determination. They submitted pictures depicting his involvement at the various family gatherings. He lived independently and worked for a bus company driving a school bus. He enjoyed morning walks, fishing and gardening, and was involved with his church, helping with repairs.

Clarke's 56-year-old daughter Delores Alexander testified that she was not currently employed. She was dealing with her own personal medical issues because she had suffered a stroke in 1996. She regained her ability to walk and avoided having to live in a nursing home due to her parents' help and, especially, her father's encouragement and emotional support. She tried to visit her father, a widower, at his home every day because it gave her something to do to try to better herself. She described him as a tough taskmaster who refused to allow her to wallow in self-pity. After his death, she understood better the lessons about independence and determination that he was trying to instill in her.

Clarke's 55-year-old son Elpento Clarke testified that he worked in customer service for an airline and currently lived in Clarke's house with his brother Garcia. When he lived in St. Louis, Missouri, he spoke with his father, who was his friend and advisor, frequently by telephone. Elpento relied on his father's advice in raising his own nine-year-old daughter, and the three of them would periodically go out to restaurants, the zoos, the lakefront or do other activities like fishing. Because Elpento worked in the airline industry, he and his father were able to fly at significant discounts and consequently took trips to Texas to visit Clarke's youngest son Labinco, to England and Jamaica to visit relatives, and to Rome as Catholics. Longevity was a trait of the Clarke family; Clarke had siblings in their 80s and 90s who were in good health.

Clarke's 52-year-old son Garcia Clarke previously worked as a computer technician. He was attending school to change fields and not currently employed. He and his father visited each other frequently at their homes. Garcia explained that he was all thumbs and enlisted his father's assistance for home repairs and maintenance. For example, in 2002, Clarke helped paint and do other various things when Garcia was preparing to sell his house. Clarke enjoyed it as a way to keep busy and spend time with his son. Garcia had lost his job and was planning on moving in with his father, and they had a few projects to do together on that house. When Garcia sold his house, he had some money and was trying to determine what he would do with his life. His father had just finished driving the bus for the school year, so they both had free time and were going to travel. They were planning to go deep sea fishing and to Europe to visit family.

The jury rendered a verdict for the plaintiff heirs and against defendants in the amount of $1,725,000, reduced by 1% for the contributory negligence of Clarke to $1,707,750. The

awarded damages were as follows: $275,000 for the pain and suffering experienced by Clarke; $250,000 for the loss of past and future gifts, benefits, goods and services of Clarke; and $1,200,000 for the loss of past and future society of Clarke.

The trial court denied defendants' posttrial motion, and defendants appealed.

ANALYSIS

1. Loss of Past and Future Gifts, Benefits, Goods and Services

The jury awarded the estate $250,000 for "loss of past and future gifts, benefits, goods, and services of [Clarke]." Defendants argue there was a complete dearth of evidence on this issue and the trial court should have granted their motion for judgment notwithstanding the verdict (judgment *n.o.v.*) on this element of damages. Specifically, defendants contend Clarke's adult, financially independent children offered no evidence of habitual guidance, services, or benefits in their recent adult lives, except for Garcia Clarke's testimony that his father helped him paint his house. Defendants argue the evidence so overwhelmingly favored them on this issue that the verdict cannot stand.

We review the denial of a motion for judgment *n.o.v. de novo*. Donaldson v. Central Illinois Public Service Co., 199 Ill. 2d 63, 88-89 (2002). Judgment *n.o.v.* should be granted only when all of the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. York v. Rush-Presbyterian-St. Luke's Medical Center, 222 Ill. 2d 147, 178 (2006).

A presumption of loss to the lineal heirs is created by the relationship of the parties alone (Hall v. Gillins, 13 Ill. 2d 26, 31 (1958)) and applies here, where both the decedent and the lineal

heirs are adults (Cooper v. Chicago Transit Authority, 153 Ill. App. 3d 511, 518 (1987)). In discussing the compensation for "pecuniary injuries" under the Wrongful Death Act, our supreme court noted that the term was interpreted broadly to include items of damage for deprivation of support as well as deprivation of the companionship, guidance, advice, love and affection of the deceased. Hall, 13 Ill. 2d at 31. See also Bullard v. Barnes, 102 Ill. 2d 505 (1984) (the court expanded the scope of pecuniary injury to include nonmonetary losses).

Here, the trial court properly instructed the jury that compensation for the next-of-kin's pecuniary loss may include loss of gifts, benefits, goods, services and society. Specifically, the jury could consider: the gifts, benefits, goods and services Clarke customarily contributed in the past and was likely to have contributed in the future; Clarke's personal expenses and other deductions; what instruction, moral training, superintendence of education Clarke might reasonably have expected to give his children had he lived; his age, sex and health; his habits of industry and thrift; his occupational abilities; and his relationship with his four children.

The record refutes defendants' claim that the testimony of Clarke's heirs did not support the award of $250,000 for past and future gifts, benefits, goods and services. Delores Alexander testified at length that her father was instrumental in her on-going recovery from her stroke. He insisted that she regain her independence and ability to walk. She visited him almost daily in an effort to remain mobile and improve herself. Elpento testified that he relied on Clarke's guidance and advice throughout his life, and found it particularly relevant in raising his own daughter. Garcia testified that when he lost his job, he embarked on a career change, went back to school and sold his house, intending to live with his father. Clarke helped Garcia with home maintenance

1-06-3072

and repairs. The painting and maintenance work they did together before Garcia sold his house was just one example of such assistance.

The evidence also established that Clarke was healthy and independent despite his advanced years, and longevity was a family trait. He drove a school bus, maintained his own home, and gave his family gifts on appropriate occasions. All of the evidence, when viewed in the light most favorable to plaintiff, does not so overwhelmingly favor defendants that the $250,000 award for Clarke's heirs based on that evidence could not stand. Therefore, we do not disturb the trial court's denial of defendants' motion for judgment *n.o.v.* on this element of damages.

### 2. Pain and Suffering

Defendants argue the trial court should have granted their motion for judgment *n.o.v.* on the element of pain and suffering, contending the evidence was not sufficient to support an award for Clarke's conscious pain and suffering. We disagree.

The plaintiff must present evidence that the injured party was conscious in order to recover for his pain and suffering. Ellig v. Delnor Community Hospital, 237 Ill. App. 3d 396, 401-02 (1992). Medical testimony is not required to establish conscious pain and suffering. Hall v. National Freight, Inc., 264 Ill. App. 3d 412, 427 (1994).

Here, plaintiff introduced evidence from both lay witnesses (Watkins and Robertson) and a medical expert (Dr. Merlotti) that Clarke suffered conscious pain and suffering before his death. Specifically, Watkins, who knelt beside Clarke for about 10 to 15 minutes after the collision, testified that Clarke looked directly at her while she spoke to him, moved his eyes–which were open–and moved his lips to ask for help but was not able to make a sound. Robertson

9

corroborated Watkins' testimony, adding that she stood over Watkins and Clarke, who was trying to speak.

Dr. Merlotti acknowledged that more than open eyes were required for a determination of consciousness. He also acknowledged the paramedics' recorded observations, which indicated that Clarke was not conscious when they arrived at the scene. Dr. Merlotti, however, testified that, according to Watkins' deposition, she observed that "Clarke was actually moving and verbalizing words; meaning that there was some conscious awareness of what was–what had happened and what was going on around him." Dr. Merlotti then opined that there potentially was a 10- to 15-minute period of conscious pain and suffering, assuming that Watkins' observations about Clarke were accurate.

On appeal, defendants contend Dr. Merlotti's expert opinion that Clarke was conscious was based on his mistaken assumption that Watkins actually heard Clarke's spoken words. The record, however, refutes defendants' assertion that Dr. Merlotti misunderstood Watkins' deposition testimony. Specifically, on redirect examination of Dr. Merlotti, the following exchange occurred:

"Q. [Plaintiff's Attorney:] Now just so we're clear, Ms. Watkins provided testimony beyond just seeing Mr. Clarke's eyes open. She also indicated that he mouthed the word help to her, correct?

A. I believe on–somewhere in Pages 38 to 46 she did testify that he was trying to say words and she thought one of them was help, yes."

In any event, defendants failed to object at trial to Dr. Merlotti's testimony or cross-examine him regarding his understanding of Watkins' observations. Furthermore, defendants' argument concerning a mistaken assumption would have affected merely the weight of Dr. Merlotti's testimony and not its admissibility. All of the evidence, when viewed in the light most favorable to plaintiff, does not so overwhelmingly favor defendants that an award for Clarke's pain and suffering based on the testimony of Watkins, Robertson and Dr. Merlotti could not stand. Therefore, we do not disturb the trial court's denial of defendants' motion for judgment *n.o.v.* on this element of damages.

### 3. Jury Instruction for Pain and Suffering

Defendants contend the trial court committed reversible error when it instructed the jury on the element of damages of pain and suffering. Defendants claim the instruction was confusing, misleading and highly prejudicial because the modifier *conscious* was not included in the jury instruction. We find that defendants failed to preserve this issue for review and the trial court did not abuse its discretion in giving the jury instruction.

A jury instruction is justified if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. Demos v. Ferris-Shell Oil Co., 317 Ill. App. 3d 41, 56 (2000). "The decision to give or deny a jury instruction is within the trial court's discretion, and a new trial should be granted only if a party's right to a fair trial has been seriously prejudiced." Demos, 317 Ill. App. 3d at 56. In reviewing this issue, we consider "whether, taken as a whole, the instructions fully, fairly and comprehensively informed the jury of the relevant legal principles." Demos, 317 Ill. App. 3d at 56.

1-06-3072

According to the record, defendants moved for a directed verdict on the conscious pain and suffering claim, arguing there was contradictory evidence concerning Clarke's consciousness. The trial court, however, found the testimony sufficient to present the issue to the jury and denied the motion.

At the conference on jury instructions, defendants objected to the tendered jury instruction concerning pain and suffering damages, arguing the same reason set forth with their motion for a directed verdict, *i.e.*, insufficient evidence of consciousness to present the pain and suffering issue to the jury. Defendants did not argue that the instruction was incomplete because it lacked the modifier *conscious* and did not present any alternative jury instruction to the trial court for its consideration that included the term *conscious* before the reference to pain and suffering. The court gave the tendered jury instruction over defendants' objection.

In accordance with the Illinois pattern civil jury instructions (Illinois Pattern Jury Instructions, Civil, Nos. 30.01, 30.05 (2006) (hereinafter IPI Civil (2006)), the following instruction was tendered to the jury regarding the survival claim:

"On the survival action, if you decide for the Plaintiff, Garcia Clarke, Independent Executor of the Estate of George Clarke, Jr., on the question of liability, you must then fix the amount of money which will reasonably and fairly compensate George Clarke, Jr., for any of the following elements of damages proved by the evidence to have resulted by the negligence of the Defendants taking into consideration the nature and extent and duration of the injury:

12

1-06-3072

1. the disfigurement resulting from the injury;

2. the pain and suffering experienced; and

3. the disability experienced.

Whether any of these elements of damages has been proved by the evidence is for you to determine."

In their posttrial motion, defendants argued for the first time that "the modifier 'conscious' should have [preceded] the words 'pain and suffering'." Defendants' posttrial motion also referred to the comments in IPI Civil (2006) No. 31.10 and the cases cited therein.

By failing to timely raise an objection at trial, defendants forfeited review of the issue of the inclusion of the modifier *conscious* in the instructions for damages for pain and suffering. Morgan v. Richardson, 343 Ill. App. 3d 733, 742 (2003) (failure to both object at trial and raise the issue in a posttrial motion forfeits it on appeal). The record establishes that defendants failed to raise this argument during the conference on jury instructions and failed to tender any alternative jury instruction to the trial court. Barry v. Owens-Corning Fiberglas Corp., 282 Ill. App. 3d 199, 205 (1996) ("A party ordinarily will not be heard to complain about a jury instruction unless it offers a proposed alternative").

Such forfeiture notwithstanding, we find that the trial court properly instructed the jury on the pain and suffering claim. The text, notes on use, and comments for IPI Civil (2006) Nos. 30.01 and 30.05 do not even mention inclusion of the modifier *conscious*. Moreover, IPI Civil (2006) No. 31.10, which concerns survival action damages, does not state that the modifier *conscious* must be included in the instruction tendered to the jury. IPI Civil (2006) No. 31.10.

13

Rather, the cases cited within the comments for IPI Civil (2006) No. 31.10 indicate merely that consideration of the decedent's consciousness is covered by the language instructing the jury to consider the "nature, extent, and duration" of the pain and suffering "during the period between the time of the decedent's injuries and the time of his death." IPI Civil (2006) No. 31.10, (Comment, at 157, citing Murphy v. Martin Oil Co., 56 Ill. 2d 423 (1974), and Glover v. City of Chicago, 106 Ill. App. 3d 1066 (1982)).

Furthermore, the cases cited by defendants on appeal do not support their assertion that the modifier *conscious* must be inserted into the text of the instruction for pain and suffering damages. In Bullard, 102 Ill. 2d at 520, the defendants argued that the jury was given repetitious and inconsistent instructions that sometimes referred to "pain and suffering" and other times to "conscious pain and suffering." The defendants argued the jury might infer that there was such a thing as "unconscious pain and suffering." Bullard, 102 Ill. 2d at 520. Our supreme court, however, ruled that such inconsistent use of the word *conscious* in the jury instructions was not reversible error. In Northern Trust Co. v. County of Cook, 135 Ill. App. 3d 329, 334 (1985), which involved malpractice litigation concerning a profoundly retarded child, it was not reversible error to refuse the tendered jury instruction specifying that the plaintiff should recover only for *conscious* pain and suffering where plaintiff's therapist testified the plaintiff responded to the pain associated with vigorous physical therapy.

Here, in contrast, no jury instruction including the modifier *conscious* was ever tendered to the trial court. Furthermore, the trial court's clear jury instruction was reinforced by counsel's examinations of the witnesses and closing arguments, which emphasized to the jury the

14

importance of the issue of Clarke's consciousness for the 10- to 15-minute time period after the collision. The record refutes defendants' assertion that the instruction could have confused the jury on the pain and suffering issue and affected the jury's understanding of whether plaintiff had met his burden of proof. We conclude that the trial court properly instructed the jury on the element of pain and suffering, the evidence supported the jury's verdict awarding $275,000 for Clarke's pain and suffering, and the trial court properly denied defendants' motion for a new trial regarding the jury instruction issue.

### 4. The Special Interrogatory

Defendants argue that plaintiff's counsel's reference to the special interrogatory during closing argument deprived them of a fair trial. Defendants contend plaintiff's counsel advised the jury of the source and effect of the special interrogatory and, thus, incited the jury's passion and prejudice.

According to the record, defendants tendered a special interrogatory that asked the jury:

"Was contributory negligence on the part of George Clarke Jr. more than 50 percent of the total combined negligence which proximately caused his injuries and death?"

During closing argument, the defense argued that even though Clarke caused the accident by running into the street and Griffin exercised more than ordinary care when he drove the moving van, defendants still ended up in court for four days, listening to demands for incredible sums of money because Watkins and Robertson would say anything to help the plaintiff's case. In response, plaintiff's counsel argued that Clarke's family, for the last several days, had to listen to

specific descriptions of Clarke's death and suffering, plus defendants' assertion that the collision was Clarke's fault. Then, plaintiff's counsel, referencing defendants' argument, said:

> "And we're not only going to say it's his fault. We are going to go for the home-run. Not guilty. It's all his fault or he was more than 50 percent contributory negligence [*sic*]. That's what that means. The special interrogatory is the home-run."

The defense objected, and the trial court overruled the objection, noting counsel had not "crossed the threshold of what you all know what it is." Plaintiff's counsel proceeded to argue that no negligence was attributable to Clarke, that a pedestrian in the crosswalk has the right-of-way, and defendants were not entitled to any reduction of their responsibility.

The jury answered the special interrogatory in the negative, rendered a verdict finding for plaintiff and against defendants, and found 1% of the negligence attributable solely to Clarke.

Special interrogatories test the general verdict against the jury's conclusions as to the ultimate controlling facts. Sommese v. Maling Brothers, Inc., 36 Ill. 2d 263, 267 (1967). Consequently, telling the jury to conform its answer to a special interrogatory to its verdict and revealing which party submitted the interrogatory has been held to constitute reversible error because it allows the jury to protect its verdict without regard to the evidence. Sommese, 36 Ill. 2d at 266 (reversible error where counsel informed the jury that the defendant "slipped in" the special interrogatory, that the jury's answer to it supercedes the verdict, and that the jury should harmonize its answer to the interrogatory with the verdict so as not "to deprive this woman of any right to recovery"). However, an attorney is not prohibited from commenting on a special

16

interrogatory in closing argument or suggesting how a special interrogatory should be answered. See <u>DeFranze v. Valenzia</u>, 118 Ill. App. 2d 306, 310 (1969) (counsel's reference to several verdict forms and the special interrogatory and suggestion of the proper answer the jury should reach on the special interrogatory did not constitute improper urging that the interrogatory answer should conform to the general verdict); <u>Ehret v. Loyal Protective Life Insurance Co.</u>, 112 Ill. App. 2d 289, 295 (1969) (explanation of special interrogatory and suggestion that jury should answer in one way was entirely proper and not a violation of <u>Sommese</u>). In <u>Blevins v. Inland Steel Co.</u>, 180 Ill. App. 3d 286, 292 (1989), the court noted that "[w]hile the distinction may seem slight, the cases do hold that [an attorney's suggestion to the jury that the plaintiff would not recover if the jury answered the interrogatory in the affirmative] is not error, whereas if the attorney takes the next step and instructs them to harmonize the interrogatory answer with the general verdict, reversible error may result."

Here, plaintiff's counsel did not tell the jury that defendants were the source of the special interrogatory. Moreover, plaintiff's counsel did not tell the members of the jury to harmonize their special interrogatory answer and verdict. Therefore, we follow <u>Blevins</u> in holding that plaintiff's counsel's remark did not constitute reversible error.

### 5. Closing Argument

Defendants contend the cumulative effect of inflammatory comments during plaintiff's closing argument deprived them of a fair trial and merits the granting of a new trial.

Attorneys are afforded wide latitude during closing argument and may comment and argue on the evidence and any inference that may be fairly drawn from that evidence. <u>Black v. Laggren</u>,

17

1-06-3072

313 Ill. App. 3d 39, 44 (2000). Improper comments by counsel constitute reversible error only where the comments are so prejudicial as to deprive the other party of the right to a fair trial. Balzekas v. Looking Elk, 254 Ill. App. 3d 529, 535 (1993). Issues concerning the prejudicial effect of comments made during closing argument are within the discretion of the trial court, and determinations regarding such issues will not be reversed absent a clear abuse of discretion. Compton v. Ubilluz, 353 Ill. App. 3d 863, 873 (2004). "In determining whether there has been an abuse of discretion, we may not substitute our judgment for that of the trial court, or even determine whether the trial court exercised its discretion wisely." Simmons v. Garces, 198 Ill. 2d 541, 568 (2002).

First, defendants complain plaintiff's counsel invited the jury to trade places with the decedent. According to the record, the trial court overruled defendants' objection when plaintiff's counsel stated, "Who would trade spots with George Clarke as he laid [*sic*] on the ground with his chest moving in and out?"

"Juries specifically should not be asked to put themselves in the places of the parties." Chakos v. Illinois State Toll Highway Authority, 169 Ill. App. 3d 1018, 1029 (1988). Here, counsel's statement was not inappropriate because it did not refer to the jurors.

Next, defendants complain that plaintiff's counsel accused them of attempting to "kick [Clarke] in the grave." According to the record, plaintiff's counsel argued that the defense's suggestion that Clarke's children somehow pieced together photographs and testimony to falsely portray a close relationship with Clarke was "to kick him in the grave." We find no improper argument here; plaintiff's counsel merely responded to defense counsel's argument that plaintiff

18

exaggerated damages and disingenuously fabricated a claim. Lee v. Grand Trunk Western R.R. Co., 143 Ill. App. 3d 500, 520 (1986).

Finally, defendants complain that plaintiff's counsel accused them of hiding a witness when he said, "Where is the passenger? Where are the Medley's Mover's–" According to the record, the trial court sustained defendant's objection and instructed the jury that witnesses that are not available to both parties may not be commented on, and that absences may not be commented on.

A reference to a witness outside the control of a party is improper. Wetherell v. Matson, 52 Ill. App. 3d 314, 318-19 (1977). However, we find that the remark about an absent witness was harmless in the context of the entire trial, given the fact that the court sustained defendants' objection to the remark. See Ramirez v. City of Chicago, 318 Ill. App. 3d 18, 26 (2000). Moreover, the record indicates that the defense provoked the response when it attacked Watkins' credibility by arguing that she could not tell how many people were in defendants' truck whereas Robertson thought there were three people in the front seat and defendant Griffin was speaking with one of them.

Consequently, we conclude that plaintiff's closing argument was not prejudicial and, when viewed in its entirely, did not deprive defendants of a fair trial. Accordingly, the trial court did not err in denying defendants' motion for a new trial on that basis.

## 6. Remittitur

Defendants contend we should order a remittitur of the damage amounts awarded, or, if remittitur is refused by plaintiff, order a new trial on the issue of damages. Defendants complain that the $275,000 for Clarke's pain and suffering, the $250,000 for the loss of past and future

19

gifts, benefits, goods and services of Clarke, and the $1,200,000 for the loss of Clarke's past and future society were unreasonably high and unsupported by the evidence.

The purpose of remittitur is to correct excessive jury verdicts in limited and appropriate circumstances. Best v. Taylor Machine Works, 179 Ill. 2d 367, 411 (1997). The standard of review applied to a trial court's refusal to grant a motion for remittitur is abuse of discretion. Buckholtz v. MacNeal Hospital, 337 Ill. App. 3d 163, 168 (2003).

The trier of fact determines the amount of damages, and reviewing courts give great deference to a jury's damage award. Richardson v. Chapman, 175 Ill. 2d 98, 113 (1997). An award of damages will be considered excessive only if it exceeds the range of fair and reasonable compensation, results from passion or prejudice, or is so large that it shocks the judicial conscience. Best, 179 Ill. 2d at 412. A reviewing court will order a new trial on damages only if the amount awarded bears no reasonable relationship to the loss suffered by plaintiff or is unsupported by the manifest weight of the evidence and the opposite conclusion is clearly evident. York, 222 Ill. 2d at 178-79. Illinois courts have consistently rejected the approach of attacking the propriety of a particular award by analogizing it to another verdict. Verlarde v. Illinois Central R.R. Co., 354 Ill. App. 3d 523, 547-48 (2004); Drews v. Global Freight Lines, Inc., 197 Ill. App. 3d 1049, 1059 (1990).

As discussed above, the record refutes defendants' assertion that the evidence does not support the awards for Clarke's pain and suffering, and for his heirs' loss of past and future gifts, benefits, goods and services. Furthermore, as in this case, where a decedent leaves adult children, the law presumes a pecuniary loss which obtains solely from the children's relationship to the

20

decedent. See, *e.g.*, Balzekas, 254 Ill. App. 3d at 537. Plaintiff presented substantial evidence concerning the loss of society to Clarke's four children to bolster the legal presumption that they sustained substantial pecuniary loss. The jury learned that Delores and Garcia saw Clarke frequently. Delores's almost daily visits to her father motivated her to improve herself as she continued to deal with medical issues from her stroke. Moreover, Garcia intended to live with his father while he changed careers and completed school. Clarke helped Garcia with home repairs as a way to stay active and spend time with his son. Because they both had some free time, Garcia and Clarke planned to travel to do some deep sea fishing and visit family in Europe. Elpento explained that his job allowed him to travel by plane as frequently and easily as if he were merely taking the bus. Consequently, he saw his father often, and they traveled to visit other relatives, including Clarke's youngest son Labinco and his family in Texas.

The jury also learned that although Clarke was 83 years old, he was healthy, independent, and active. He enjoyed traveling, fishing, gardening, daily walks, and assisting others as a handyman. Moreover, Clarke was still able to maintain employment as a school bus driver. He enjoyed a family history of longevity and was likely to continue defying the average life expectancy listed in the life table statistics because, according to Dr. Merlotti, Clarke's life expectancy increased as he continued to age and enjoy good health.

The trial court agreed that there was sufficient evidence presented at trial to support the jury's award of damages. The trial court did not abuse its discretion in denying defendants' motion for remittitur.

CONCLUSION

For the reasons explained above, we affirm the judgment of the circuit court denying

defendants' motion for judgment *n.o.v.*, a new trial, and remittitur.

Affirmed.

FITZGERALD SMITH, P.J., and GALLAGHER, J., concur.

1-06-3072

<u>REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT</u>
(Front Sheet to be Attached to Each Case)

<u>GARCIA CLARKE, as Executor of the Estate of George Clarke, Jr., Deceased,</u>

<u>Plaintiff-Appellee,</u>

<u>v.</u>

<u>MEDLEY MOVING AND STORAGE, INC., and GREGORY GRIFFIN,</u>

<u>Defendants-Appellants.</u>

<u>No. 1-06-3072</u>

<u>Appellate Court of Illinois</u>
<u>First District, FIFTH DIVISION</u>

<u>March 7, 2008</u>

<u>Justice Margaret O'Mara Frossard authored the opinion of the court:</u>

<u>Presiding Justice Fitzgerald Smith and Justice Gallagher concur.</u>

<u>Appeal from the Circuit Court of Cook County.</u>
<u>The Hon. John B. Grogan, Judge Presiding.</u>

**COUNSEL FOR DEFENDANTS-APPELLANTS**
Haynes, Studnicka, Kahan, O'Neill & Miller, LLC, Chicago, IL 60604
OF COUNSEL: Shimon B. Kahan and Elana K. Seifert

**COUNSEL FOR PLAINTIFF-APPELLEE**
Power Rogers & Smith, P.C., Chicago, IL 60602
OF COUNSEL: Larry R. Rogers, Jr.