2019 IL App (1st) 181705-U

FIRST DISTRICT
SECOND DIVISION
November 19, 2019

No. 1-18-1705

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GLORIA TIRADO and CHRISTIAN TIRADO, Plenary Guardians of the Estate and Person of GINA GUTIERREZ, a disabled person, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) ) | |
| v. | ) ) | No. 17 L 7120 |
| KONSTANTIN SLAVIN and GERALD OH, | ) ) ) | The Honorable James M. Varga, |
| Defendants-Appellees. | ) ) ) ) | Judge Presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

*Held*:  Trial court did not abuse its discretion in denying plaintiffs' motion for a mistrial, where there was no evidence of prejudice when a juror became ill during closing arguments. Trial court did not abuse its discretion in limiting plaintiffs' expert testimony and modifying plaintiffs' proposed jury instructions.

¶ 1        Gloria Tirado and Christian Tirado, plenary guardians of Gina Gutierrez's estate and person, brought a medical malpractice action against Konstantin Slavin, M.D. and Gerald Oh, M.D., alleging that the physicians negligently performed Gutierrez's spinal surgery and were

negligent in their follow-up care. In response, Dr. Slavin raised an affirmative defense of contributory negligence for Gutierrez's failure to seek treatment and follow medical advice. The case proceeded to jury trial and, during plaintiff's closing argument, Dr. Slavin and his counsel came to the aid of an ill juror. Plaintiffs moved for mistrial the following morning, which the trial court denied. The trial court entered judgment on a verdict for Dr. Slavin[1] and denied plaintiffs' motion for a new trial. For the reasons set forth below, we affirm the trial court's denial of plaintiffs' motion for mistrial and post-trial motion for a new trial.

¶ 2                                    BACKGROUND

¶ 3         On June 21, 2011, Dr. Slavin surgically removed a cyst from Gina Gutierrez's lower spine. Ordinarily, patients are kept overnight following this type of surgery; however, Gutierrez chose to stay an extra night and was discharged from the hospital on June 23, 2011. At that time, Gutierrez complained of throbbing headaches upon sitting and pain at the surgical site. A cerebral spinal fluid (CSF) leak is a potential complication associated with this type of surgical procedure, signs of which include positional headaches (those which worsen with movement), nausea, and vomiting. Gutierrez also suffered from chronic headaches and dizziness and had experienced nausea and vomiting after anesthesia in the past. At the time she was discharged, Dr. Slavin believed that Gutierrez's post-surgical headaches were consistent with her pattern of chronic headaches, because they did not worsen when she stood up or moved around.

¶ 4         On June 28, 2011, Gloria Tirado called the clinic and reported that Gutierrez was experiencing headaches and increased redness and swelling at the surgical site, but did not have active drainage or fever. Dr. Slavin and Nurse Filoramo testified that Tirado was advised to bring Gutierrez to the emergency room at that time. Tirado denied being advised to go to the

---

[1] The trial court entered a directed verdict in favor of Dr. Oh on February 8, 2018. Plaintiffs do not challenge this ruling on appeal.

emergency room. Tirado called the clinic again on July 1, 2011 and reported that Gutierrez continued to wake up with headaches and would like stronger medication for her pain. According to Dr. Slavin and Nurse Filoramo, Dr. Slavin did not prescribe Gutierrez more medication at that time; rather, Tirado was advised to bring Gutierrez to the clinic if her symptoms did not subside. Tirado denied being advised to bring Gutierrez to the clinic. She testified that Nurse Filoramo advised her to double up on medication.

¶ 5        Gutierrez was readmitted to the hospital on either July 5 or July 6 of 2011[2], because she was suffering from severe post-operative headaches and fluid had been draining from her incision for about a week. She was diagnosed as having positional headaches and a CSF leak. Upon her re-admission, blood tests showed no signs of infection and Gutierrez was not suffering from symptoms that would indicate meningitis, such as neck stiffness or nausea. In the afternoon or early evening of July 6, Dr. Slavin requested an MRI, which showed a collection of fluid outside of Gutierrez's spinal canal. On July 7, 2011, Dr. Slavin performed a blood patch procedure in an effort to reduce Gutierrez's headaches, and he took a sample of CSF, which again showed no signs of infection.

¶ 6        By the early morning of July 8, 2011, Gutierrez's condition had significantly deteriorated, and it was clear that the blood patch procedure had been unsuccessful. By 6 a.m. on July 8, her pain level was at 10 out of 10. Around 8 a.m., Gutierrez began experiencing neck pain and a fever and her arm began shaking, so the nurse requested that Gutierrez undergo a CT scan. On her way back from the CT scan, Gutierrez became unresponsive. At or around that time, Dr. Slavin began treating Gutierrez with antibiotics for possible meningitis and she was transferred to the ICU for close monitoring. He also received results from a blood test performed earlier that

---

[2] There is conflicting testimony regarding the actual date of Gina's admission to the hospital in July.

morning, which indicated that Gutierrez was suffering from an infection. At approximately 2:50 p.m. on July 8, Gutierrez began turning blue, so she was intubated and Dr. Slavin ordered medication to relieve possible swelling and inflammation in her brain.

¶ 7        Around 4:43 p.m. on July 8, Gutierrez was taken for a second CT scan, which showed severe brain swelling (cerebral edema) and herniation of the cerebellar tonsils.[3] Dr. Slavin attempted to reduce the brain swelling using medication and hypertonic saline. An MRI was performed around 9 p.m., which showed that Gutierrez had suffered a stroke at the bottom of her brain.

¶ 8        Just after midnight on July 9, 2011, Dr. Slavin performed a craniectomy to relieve the pressure in Gutierrez's skull and remove the cerebral tonsils. He also repaired the CSF leak in her lower back and noted that there was an infection, which likely caused meningitis.

¶ 9        At trial, plaintiffs presented testimony from John Merritt, M.D. regarding the extent of Gutierrez's injuries. Dr. Merritt testified that as a result of cerebellar tonsil herniation and brain stem compression, Gutierrez suffers from partial paralysis in all four limbs, incontinence, inability to sit or bear weight, and involuntary muscle spasms. Among other conditions, she also has involuntary eye spasms, double vision, headaches, and mood swings. Gutierrez has impaired cognitive abilities and requires 24-hour skilled nursing care.

¶ 10        Plaintiffs also presented expert testimony from Mark Glickstein, M.D. and Robert Erickson, M.D. Dr. Glickstein testified that the CT scans taken between July 6 and July 8 showed a progression of brain swelling and cerebellar tonsil herniation. Dr. Erickson testified that Dr. Slavin deviated from the standard of care when he discharged Gutierrez after her first

---

[3] According to testimony elicited at trial, the cerebellar tonsils lie against the brainstem and, under normal circumstances, float freely. When there is a herniation, the tonsils move down into a compartment where they don't belong, compressing the blood vessels and cutting off oxygen to the brain.

hospitalization, when he failed to treat her brain swelling on the morning of July 8, and when he failed to immediately treat Gutierrez at or around the time of the second CT scan around 4:43 p.m. on July 8.

¶ 11    During Dr. Erickson's testimony, defense counsel repeatedly objected to questions regarding the chronology of treatment Dr. Slavin should have followed after the 4:43 p.m. CT scan on July 8, arguing that Dr. Erickson's opinion on this issue was not disclosed in plaintiffs' Rule 213 disclosures. The trial judge ultimately sustained the objections and allowed Dr. Erickson to testify that "[the] standard of care at that point would require a timely administration of effective medications such as Mannitol or hypertonic saline or it was mandatory that the patient be taken to the operating room for a surgical procedure with the same goal in mind; that is, to lower the intracranial pressure as soon as possible."

¶ 12    The defense presented testimony from Dr. Slavin, and experts Dr. Nitu Saran, Dr. Susan Payvar, and Dr. Harel Deutsch. Dr. Slavin testified that he met the applicable standard of care in treating Gutierrez. Dr. Saran and Dr. Payvar testified regarding their interpretations of the CT scans conducted on July 6 and 8. Dr. Deutsch testified that Dr. Slavin met the standard of care and that Gutierrez's failure to come to the hospital sooner increased her risk of getting meningitis.

¶ 13    During plaintiffs' closing argument, a juror became ill. The judge announced "we will need a break," and instructed the ill juror to "go to the jury room." There is no contemporaneous record of the events that transpired; however, it is undisputed that the ill juror went to the jury room, followed by two other jurors, one of whom is a registered nurse. At some point, someone called from the jury room that the ill juror was not breathing. Defense counsel, who is also a nurse, stated in an affidavit that she "immediately proceeded to the jury to provide emergency

assistance as necessary." Dr. Slavin followed behind her.

¶ 14    According to defense counsel, the following occurred when she entered the jury room: "the juror was lying on the floor, apparently unresponsive and pale in color. As I knelt to feel for a pulse, the juror awoke and was speaking and seemed to be stable. At that point, I believe the deputy instructed me to return to counsel table, which I did immediately. As I exited the jury room, I asked if there was a nurse present, and a female sitting on the benches in the back of the [courtroom] responded to assist the juror until paramedics arrived. After being examined by the paramedics, the juror declined further treatment." The ill juror requested to be discharged and was replaced by an alternate juror. Closing arguments resumed and, after being instructed on the law, the jurors retired to the jury room.

¶ 15    The next morning, plaintiffs' counsel presented an emergency motion for mistrial. The judge denied the motion, finding that the disruption during closing arguments was not prejudicial. The judge noted that "if anything happened, it was quick and human . . . And then [the jury] had a full night to cool off." The jurors were not questioned regarding what impact, if any, these events had on their ability to fairly decide the case.

¶ 16    The jury returned a verdict in favor of Dr. Slavin. The trial court denied plaintiffs' post-trial motion, and plaintiffs timely appealed.

¶ 17                                  ANALYSIS

¶ 18    Plaintiffs assert that they are entitled to a new trial, because: (1) Dr. Slavin and his attorney assisting an ill juror during closing arguments warranted a mistrial, (2) the defense team had ex parte communications with jurors, (3) defense counsel violated an *in limine* order during closing arguments, (4) the trial court erroneously sustained defendant's objection to testimony by Dr. Erickson, (5) the trial court erroneously refused plaintiffs' jury instruction, and (6) the trial

court erred in denying plaintiffs' partial motion for summary judgment regarding contributory negligence.

¶ 19        Defendant urges us to disregard the arguments set forth in plaintiffs' brief for failure to comply with Illinois Supreme Court Rule 341(h)(1)-(9) (eff. May 25, 2018). The purpose of these procedural rules is to require the parties to present clear and orderly arguments to the reviewing court so that we can properly understand, evaluate and resolve the issues raised. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. With the exception of plaintiffs' arguments regarding denial of summary judgment, the errors here are not so egregious as to hinder or preclude our review of the issues involved. *Hall*, 2012 IL App (2d) at ¶ 12; *Budzileni v. Department of Human Rights*, 392 Ill. App. 3d 422, 440 (2009).

¶ 20                                                   Waiver

¶ 21        Relying on *DiCosolo v. Janssen Pharmaceuticals, Inc.*, 2011 IL App (1st) 093562 and *Bauer v. Timucci*, 33 Ill. App. 3d 1050 (1975), defendant first argues that plaintiffs' motion for mistrial was untimely and they failed to preserve their objections for review. Plaintiffs' counsel asserts that he sufficiently objected when defense counsel entered the jury room to assist the ill juror and that he timely presented plaintiffs' motion for mistrial. For the first time, in their reply brief and at oral arguments, plaintiffs also asserted that the court is required to take notice of irregularities in proceedings where the interests of an injured party with special needs are involved, despite a party's failure to object, relying on *Leonard v. Pitstick Dary Lake & Park*, 202 Ill. App. 3d 817 (1990) and *Muscarello v. Peterson*, 20 Ill. 2d 548 (1960). We do not disagree that disabled individuals are entitled to added protections under the law; however, plaintiffs' reliance on *Leonard* and *Muscarello* to support their argument is misplaced, as both courts specifically referred to protections for injured *minors*.

¶ 22    Nonetheless, we do not find *DiCosolo* and *Bauer* instructive on the issue of timeliness. In *DiCosolo*, the defendant failed to contemporaneously object but moved for mistrial following plaintiff's allegedly inflammatory closing argument. *DiCosolo,* 2011 IL App (1st) at ¶¶ 62-63. We noted that a pattern of failing to take steps to allow any "corrective" action to be taken and later claiming reversible error on appeal should not be condoned; however, we did not decide the issue of waiver. Rather, we concluded that "*[w]aiver or forfeiture aside . . .* the comments [did] not warrant a new trial." (Emphasis added.) *Id.* at ¶ 64.

¶ 23    In *Bauer*, a plaintiff began swaying and sobbing during closing arguments and defense counsel brought the matter to the court's attention, but failed to move for a mistrial. *Bauer*, 33 Ill. App. 3d at 1052. *After the jury returned a verdict for plaintiff*, defendant filed a post-trial motion for a new trial, based on the plaintiff's improper conduct during closing arguments. at 1052. We held that defendant waived the matter of plaintiff's conduct as a ground for his motion for a new trial, by failing to timely move for a mistrial. *Id.* at 1057. "The function of the timeliness requirement is not simply to avoid a second trial, but to avoid a second jury trial *where the first jury trial has reached the stage of a returned verdict*." (Emphasis added.) *Id.* at 1056. Had the motion for a mistrial been timely made and allowed, a second trial could not have been avoided, but a second verdict could have. *Id.*

¶ 24    Defendant also cites *York v. El-Ganzouri*, 353 Ill. App. 3d 1 (2004) and *McMath v. Katholi*, 191 Ill. 2d 251 (2000) to support his contentions that plaintiffs failed to preserve their objections for review, because they did not contemporaneously object to proceeding with trial, and that they consented to the errors. However, in *York*, the defendant failed to make *any* objection in the trial court and raised his objections to *voir dire* proceedings for the first time on appeal. 353 Ill. App. 3d at 10. In *McMath,* the plaintiff misled the trial court as to the law which

governed the case and took a contrary position on appeal. 191 Ill. 2d at 255-56. Neither of these circumstances is present here.

¶ 25    As there is no contemporaneous record of plaintiffs' objections during the incident, or lack thereof, we can only assume that plaintiffs' counsel only objected to defense counsel's presence in the jury room, because that fact is undisputed. However, plaintiffs raised their objections in their motion for mistrial the morning after the incident and prior to a returned jury verdict. Had the trial court allowed the motion for mistrial, the purpose of the timeliness requirement would have been met, because the court would have avoided a second verdict. We do not find that plaintiffs' motion for mistrial was untimely and find that it was sufficient to preserve the alleged errors for review.

¶ 26    Next, defendant argues that plaintiffs' mistrial argument is "all but unreviewable," because plaintiffs failed to secure a record or bystander's report of the events that occurred during the recess, in accordance with Supreme Court Rule 323(c) (eff. July 1, 2017). We disagree. Plaintiffs' failure to provide a record or bystander's report hinders our review of the circumstances, but not so significantly that we cannot review the trial court's decision. Plaintiffs provided a record of the proceedings on their motion for mistrial and post-trial motion, in which the judge and the attorneys for the parties recount the circumstances that occurred off the record.

¶ 27                                    Standard of Review

¶ 28    At the outset, the parties disagree on the applicable standard of review. For the first time in their reply brief, plaintiffs assert that we review the "unusual events of assistance to the ill juror and the ex parte interactions" *de novo* "since they involve only questions of law," relying on *Williams v. Staples*, 208 Ill. 2d 480 (2004). This is incorrect. The *Williams* court was asked to construe a statute, which presents an issue of law that we review *de novo*. *Id.* at 487.

¶ 29    It is well-established that the grant or denial of a mistrial and a post-trial motion rests within the sound discretion of the trial court and, unless it affirmatively appears that the trial court abused its discretion, the reviewing court will not interfere. *Colls v. City of Chicago*, 212 Ill. App. 3d 904, 953 (1991); *Bauer v. Timucci*, 33 Ill. App. 3d 1051, 1057 (1975). A trial court abuses its discretion only where no reasonable person would take the view adopted by the trial court. *Peach v. McGovern*, 2019 IL 123156, ¶ 25.

¶ 30                                                Mistrial

¶ 31    Turning to the merits of plaintiffs' appeal, we find that the trial court did not abuse its discretion in denying plaintiffs' motion for mistrial. A mistrial should be granted when there is an occurrence of such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice as a result. *Bianchi v. Mikhail*, 266 Ill. App. 3d 767, 777 (1994).

¶ 32    There is only one case in which our supreme court has considered whether a new trial is necessary when a physician defendant renders assistance to a juror during a medical malpractice trial. In *Campbell v. Fox*, 113 Ill. 2d 354 (1986), a juror lost consciousness during plaintiff's opening statement, and the defendant doctor carried her from the jury box to counsel table to render aid. *Campbell*, 113 Ill. 2d at 357. An ambulance was called and the juror was taken to the hospital where she recovered. *Id.* The plaintiff immediately moved for a mistrial. *Id.* The trial court denied the motion, allowing for a limited *voir dire* to ascertain what effect, if any, the occurrence had on the jurors. *Id.* "All the jurors answered that they could still be fair and impartial and that the [defendant doctor's] treatment would not prejudice them in any way." *Id.* The trial resumed, ending in a verdict favorable to the defendant. *Id.* The appellate court affirmed, and the supreme court reversed. *Id.* In holding that "a new trial [was] necessary," the

10

court observed that "the effect of the unusual events in this case . . . was so apparent as to have unquestioned influence upon the jury's ability to try the issues in controversy fairly." *Id.* The court also acknowledged that "it [was] doubtful whether the jurors could make a dispassionate evaluation of the defendant's testimony after witnessing his attempt to render immediate treatment to one of their fellow jurors." *Id.* at 359.

¶ 33    Plaintiffs argue that the "extraordinary" and "chaotic" events in this case are more persuasive than those in *Campbell*. We disagree and, in fact, the record belies plaintiffs' argument. Plaintiffs' own conduct fairly supports the inference that nothing "chaotic" or "extraordinary" occurred when the juror became ill. No objections to continuing with the proceedings were made and the attorneys for both sides agreed that the ill juror could stay or leave. Plaintiffs' counsel proceeded with closing arguments as if nothing had happened. He did not request that the court allow him to make a record of the "chaotic" events nor did he request that the court conduct a limited *voir dire* or admonish the jury prior to dismissing them or at any other time. The trial judge even conferred with the attorneys regarding whether they preferred to let the jurors deliberate or wanted them to return the next morning. Plaintiffs' counsel requested that the jurors return in the morning for deliberations, to which the trial judge agreed. The attorneys for the parties also agreed that they would not return to court in the morning. It was not until the next morning that counsel requested a mistrial after he was "directed by the co-guardians to present [the] motion."

¶ 34    Moreover, plaintiffs' failed to point to anything in the record that would support a finding that the events were extraordinary or that the verdict was the result of actual prejudice. The trial judge "was observing everybody" during the incident and found that ". . . they were startled, but . . . most of the jurors stayed in the courtroom . . . [a]nd they weren't even conversing. Everybody

11

was kind of surprised, but they weren't like crying or weeping or visibly excited. Everybody seemed kind of normal, their demeanors, personalities, attitudes." The trial court "[did not] see anything . . . inflammatory or something that's so grave or serious . . ." and observed that "[i]f anything happened, it was quick and human." During the post-trial hearing, the court observed that even if defendant was in the jury room, "[h]e didn't do anything. And then the remaining jurors who were out there didn't see him. So even if he goes in, he did not administer any medical care. I don't think he said anything; and, therefore, whoever is in the jury room saw that and the other remaining jurors in the jury box and courtroom didn't even see him not doing anything."

¶ 35    In *Campbell*, the defendant rendered aid to the juror at the beginning of trial during the plaintiff's opening statement. Our supreme court noted that even though the trial court allowed a limited *voir dire*, "the jurors could not know at the time the questions were asked that their verdict in this case would depend so heavily on the parties' credibility." *Campbell*, 113 Ill. 2d at 359. The disruption in the matter before us occurred during plaintiffs' closing argument. The jurors had an opportunity to evaluate the evidence and independently weigh the credibility of the witnesses and the parties by that point in the trial. Plaintiffs provided an affidavit from one juror recounting the events; however, the juror does not indicate that the situation influenced the verdict in any way.

¶ 36    Because there is nothing in the record to demonstrate that the verdict was the result of actual prejudice resulting in the denial of a fair trial, we find that the trial court did not abuse its discretion in denying plaintiffs' motion for mistrial and post-trial motion.

¶ 37                                    Ex Parte Communications

¶ 38    Our review of plaintiffs' argument that ex parte communications in the jury room warrant

a new trial is severely limited by plaintiffs' failure to cite to pertinent authority or support their arguments with relevant portions of the record. Plaintiffs' reliance on *Estes v. State of Texas,* 381 U.S. 532 (1965) and *Turner v. State of Louisiana*, 379 U.S. 466 (1965) is misplaced, as neither case deals with ex parte communications between attorneys and jurors. Furthermore, plaintiffs concede that communications with the two jurors who were in the jury room are unknown and any ex parte interactions were "out of sight and hearing."

¶ 39    We are not a depository in which the appellant may dump the burden of argument and research for his cause on appeal. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18. Where an appellant's brief contains numerous Rule 341 violations and impedes our review of the case because of them, the court has the right to strike the brief and dismiss the appeal. *In re Marriage of Petrik*, 2012 IL App. (2d) 110495, ¶ 38. Accordingly, we cannot review plaintiffs' argument regarding ex parte communications and must strike this portion of plaintiffs' brief.

¶ 40                     Violation of Order *in Limine*

¶ 41    Plaintiffs argue that defense counsel violated a trial court order *in limine*, barring counsel from referring to the defendant as being sorry or regretting the outcome in this case.

¶ 42    The fact that plaintiffs failed to cite to any relevant authority aside, we agree that any objections they have are waived. During defendant's closing argument, counsel stated: "I assure you that there is no one in the courtroom other than, obviously, the family who wishes more than Dr. Slavin that he had been able to not only save her life but –," at which point counsel for plaintiffs objected. Plaintiffs' counsel did not ask the court to rule on his objection nor did he make any future objections or raise this matter until plaintiffs' post-trial motion.

¶ 43    Plaintiffs' failure to ask for a ruling or assert future objections resulted in waiver. *In re*

*Marriage of Kocher*, 282 Ill. App. 3d 655, 660 (1996) (even where a proper objection is made, failure to obtain a ruling on the objection results in waiver); *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1132 (2000) (failure to object to a violation of an *in limine* order at trial forfeits the issue on appeal).

¶ 44                                Dr. Erickson's Testimony

¶ 45         Plaintiffs also argue that the trial court erred in sustaining defendant's Rule 213 objections to Dr. Erickson's testimony. In their answers to defendant's Rule 213 interrogatories, plaintiffs asserted that Dr. Erickson would testify as to defendants' deviations from the applicable standard of care, which included: (xvi) fail[ing] to prescribe or administer mannitol and/or dexamethasone for the cerebral edema in a timely manner on 7-8-11; (xvii) fail[ing] to surgically treat the patient to lower the ICP in a timely manner on 7-8-11.

¶ 46         During his deposition, Dr. Erickson testified as follows:

> Q.      So neurosurgeons acting within the standard of care might address this situation after the second CT scan differently, but something needed to be done, right?
>
> A.      Right. \*\*\* But at the point that the afternoon scan was obtained, now there was no doubt about what was likely going on, and attempts should have been made in the early evening to reverse the situation.
>
> Q.      And what would those attempts consist of?
>
> A.      There should have been some effort made to either equalize the pressure gradient or go to surgery a little sooner. There are medical measures that are available that are quicker than going to surgery. The osmotic diuretics can be given, hypertonic saline might be given.
>
>                                \*\*\*
>
> Q.      Would an osmotic diuretic, would that be like Mannitol or something like that?
>
> A.      Yes, that's perhaps the most familiar.

14

> Q. So attempts with one of those medications would have been – could have been more timely even than trying to address it surgically and would have been appropriate correct?
>
> A. Yes.
>
> Q. Alternatively, Dr. Slavin could have taken her to surgery a little sooner, right?
>
> A. Yes, that's possible, yes.
>
> Q. So in your view, basically once confronted with these findings on the CT scan and her clinical condition, obviously, there were two options, one, to address it with the medical interventions that you mentioned, and the other to take her to surgery sometime earlier that evening, true?
>
> A. True. *** But I think in general, the pressure has to be diminished in the head area even before you're able to go and repair the leak, for instance, which takes some time and is logistically difficult.

¶ 47     At trial, plaintiff's counsel asked Dr. Erickson to detail the chronology of the treatment required after the 4:43 p.m. CT scan on July 8, at which point defense counsel made a Rule 213 objection. After lengthy arguments from counsel and repeated Rule 213 objections, the trial court ultimately sustained defendant's objections to any testimony from Dr. Erickson that implied that Dr. Slavin should have administered a chronology of treatment to meet the standard of care. Dr. Erickson's eventual testimony was as follows:

¶ 48
> Q. Dr. Erickson, in your opinion, what did the applicable standard of care require of Dr. Slavin to do after the second CT scan at 4:43 p.m. in the afternoon of July 8th, 2011?
>
> A. Standard of care at that point would require a timely administration of effective medications such as Mannitol or hypertonic saline or it was mandatory that the patient be taken to the operating room for a surgical procedure with the same goal in mind; that is, to lower the intracranial pressure as soon as possible.

¶ 49    Supreme Court Rule 213(g) requires that, upon written interrogatory, a party must disclose the subject matter, conclusions, opinions, qualifications, and all reports of expert witnesses who will offer any opinion testimony. Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018). Rule 213(g) limits expert opinions at trial to the information disclosed in answer to a Rule 213 interrogatory or in a discovery deposition. *Morrisoe v. Pantano*, 2016 IL App (1st) 143605 at ¶ 37. The Rule 213 disclosure requirements are mandatory and subject to strict compliance by the parties. *Id.* The purpose of discovery rules governing timely disclosure of expert witnesses, their opinions, and the bases for those opinions, is to avoid surprise and to discourage strategic gamesmanship amongst the parties. *Id.* An expert witness may expand upon a disclosed opinion provided that the testimony states a logical corollary to the disclosed opinion and not a new basis for that opinion. *Id.* That is to say, the witness' testimony must be encompassed by the original opinion. *Id.*

¶ 50    A trial court's ruling on the admission of evidence is an exercise of discretion and will not be reversed absent an abuse of that discretion. *Id.* at ¶ 38. "If an opinion is important to the theory of one's case, it is essential that it and the bases for it be disclosed. This is a bright line rule and must be followed." *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 24 (1997).

¶ 51    Plaintiffs did not disclose that Dr. Erickson would testify regarding a chronology of treatment that Dr. Slavin should have administered to meet the standard of care. Rather, Plaintiffs provided a list of deviations with no qualifying language or timeline. Further, during his deposition, Dr. Erickson opined that, in order to meet the standard of care after the 4:43 p.m. CT scan, Dr. Slavin could have administered medications or he could have taken Gina to surgery earlier. Testimony that Dr. Slavin should have administered one treatment before the other would provide a new basis for Dr. Erickson's opinion that Dr. Slavin deviated from the standard of care.

Accordingly, we find that the trial court did not abuse its discretion when it sustained defense counsel's objections to the admission of undisclosed opinion testimony.

¶ 52                                    Jury Instructions

¶ 53         Next, we reject plaintiffs' argument that the trial court erred in refusing their tendered jury instruction. Plaintiffs tendered proposed instructions consistent with Illinois Pattern Jury Instructions, Civil No. 20.01(2011):

> Gina Gutierrez claims that she was injured and sustained damage, and that the defendant, Konstantin Slavin, was negligent in one or more of the following respects:
>
> (i)      Improperly discharged Gina Gutierrez from the hospital on June 23, 2011.
>
> (ii)     Failed to order or administer mannitol or hypertonic saline in a timely manner.
>
> (iii)    Failed to perform a surgery in a timely manner.

Over counsel's objection, the court combined (ii) and (iii) as follows: (i) improperly discharged Gina Gutierrez from the hospital on June 23, 2011, (ii) failed to order or administer mannitol or hypertonic saline in a timely manner; or failed to perform a surgery in a timely manner. Plaintiffs argue that the second and third deviations were distinct and occurred at different times, so the revised instruction misled the jury.

¶ 54         A jury instruction is justified if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. *Clarke v. Medley Moving and Storage, Inc.*, 381 Ill. App. 3d 82 (2008). In reviewing this issue, we consider whether, taken as a whole, the instructions fully, fairly and comprehensively informed the jury of the relevant legal principles. *Id.*

¶ 55         Here, plaintiffs' own proposed instruction was nearly identical to the revised instruction

given to the jury and did not include any additional qualifying information. The revised instruction informed the jury regarding the same issues as in plaintiffs' proposed instruction and was justified by the testimony offered by plaintiffs' expert witness. Accordingly, we do not find that the trial court abused its discretion in modifying plaintiffs' tendered jury instruction.

¶ 56                                    Partial Motion for Summary Judgment

¶ 57        Finally, plaintiffs argue, without providing a standard of review, citations to relevant authority or to relevant portions of the record, that the trial court erred in denying their partial motion for summary judgment. For example, plaintiffs improperly rely on trial testimony in support of their contention that the trial court should have granted their partial motion for summary judgment *prior* to trial.

¶ 58        Furthermore, plaintiffs rely on *Newell v. Corres*, *M.D.*, 125 Ill. App. 3d 1087 (1984) and *Corlett v. Caserta*, 204 Ill. App. 3d 403 (1990); however, neither of these cases is supportive of plaintiffs' position. In *Newell*, a patient who was treated for a jaw fracture brought a medical malpractice action against the surgeon who treated the fracture. *Newell*, 125 Ill. App. 3d at 1089. The trial court directed a verdict as to liability in plaintiff's favor, upon which the jury reached a comparative negligence verdict, reducing plaintiff's damages by one-third. *Id.* at 1091. We reversed the trial court's directed verdict, holding that a patient's refusal of treatment is a factor to be weighed by the jury in determining relative degree of negligence attributable and presents a genuine question of fact as to causation and comparative negligence. *Id.* at 1094-95.

¶ 59        In *Corlett*, a wrongful death suit was brought against a physician arising from the death of a patient who refused medical treatment for religious reasons. *Corlett*, 204 Ill. App. 3d at 406. The trial court granted the physician's motion for summary judgment and we reversed, specifically holding that refusal of treatment "is an element which may be considered by the

factfinder in deciding issues of proximate cause and comparative fault, and that these questions cannot be resolved as a matter of law in the instant appeal." *Id.* at 407.

¶ 60 Rule 341(h)(7) requires that the appellant's arguments contain his or her contentions and the reasons therefor, with citations to authorities and to the pages of the record relied upon in support of the appellant's contentions. Ill. S. Ct. R. 341(h)(7)(eff. May 25, 2008). The consequence of plaintiffs' violation of these mandatory requirements in this case is forfeiture of their argument. *Niewold v. Fry*, 306 Ill. App. 3d 735 (1999).

¶ 61                                CONCLUSION

¶ 62 The trial court did not abuse its discretion in denying the plaintiffs' motion for mistrial and post-trial motion.

¶ 63 Affirmed.