2025 IL App (1st) 231520-U

SIXTH DIVISION

June 27, 2025

No. 1-23-1520

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MOHAMMAD SALAMAH and SALWA SALAMAH, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) | |
| v. | ) ) | No. 16 L 8549 |
| DR. ALI KUTOM, M.D. METRO CARDIOVASCULAR CONSULTANTS, LTD., a domestic corporation, NOURI AL-KHALED, M.D., THE CARDIOLOGY GROUP, LLC, a limited liability company, CONSULTANTS IN CARDIOLOGY & ELECTROPHYSIOLOGY, LLC, a limited liability company, SEAN MOTZNY, M.D., THERESA NAVARRETE, M.D., MARK BAMMAN, M.D., VINITA SINGH, M.D., NATALIA SZAFLARSKI, D.O., ADVOCATE CHRIST HOSPITAL HEALTH PARTNERS a domestic corporation d/b/a ADVOCATE CHRIST HOSPITAL PHYSICIAN PARTNERS, ADVOCATE HEALTH AND HOSPITALS CORPORATION, a domestic corporation d/b/a ADVOCATE CHRIST MEDICAL CENTER and ADVOCATE MEDICAL GROUP, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) ) | Honorable Elizabeth M. Budzinski, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held:*    We affirm the jury's verdict for all defendants in this medical malpractice case over plaintiffs' claims that the circuit court made erroneous evidentiary rulings under Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018), defense attorneys made improper remarks in closing arguments, and the court incorrectly barred admissible lost wages testimony.

¶ 2    Plaintiffs Mohammad and Salwa Salamah (collectively, "plaintiffs") bring this medical malpractice case arising from treatment Mohammad received for a ST-segment elevation myocardial infarction (STEMI), commonly known as a heart attack, on November 2 and 3, 2014. Mohammad arrived at the emergency room (ER) at Advocate Christ Hospital in Oak Lawn, Illinois, complaining of severe chest pain. A patient presenting with chest pain may or may not be experiencing a STEMI, which is only one of a potential series of diagnoses under the umbrella of acute coronary syndrome, or ACS. His first documented treatment was at 9:30 p.m. He was not initially diagnosed with a STEMI and instead admitted to the hospital's telemetry floor. Hours later, following his admission, he was diagnosed with a STEMI for which he received treatment around 3 to 3:30 a.m.

¶ 3    The defendants include multiple physicians and nurses who treated Mohammad: (1) Drs. Sean Motzny, Mark Bamman, and Theresa Navarette, each of whom treated him in the ER (collectively, the "ER doctors"); (2) Dr. Nouri Al-Khaled, Advocate's on-call interventional cardiologist that night; (3) Dr. Ali Kutom, Mohammad's cardiologist and primary care physician;

and (4) wo nurse employees of Advocate, Ora Rempson and Waileen Chu.[1] Generally, myocardial infarction involves a blockage in a patient's artery such that blood flow is restricted to the heart. This loss of blood flow is called ischemia, and when it occurs, the lack of blood to the heart causes damage to heart tissue, a process known as infarction. If blood flow is not restored in a timely fashion, heart tissue will die permanently, which can cause severe health issues including death.

¶ 4    Physicians diagnose whether a patient is suffering a STEMI by using electrocardiogram (EKG) studies. The EKG results must meet certain criteria, generally referred to by the physician witnesses in this case as "elevations" in certain "segments." When a threshold elevation is met for a sufficient number of segments, this indicates that the patient is suffering a STEMI and needs immediate treatment to remove the blockage in the artery. This treatment, percutaneous coronary intervention (PCI), occurs in a "catheterization laboratory" (cath lab). Mohammad received three EKGs—two upon his arrival, at 9:47 p.m. and 10:21 p.m., after which Motzny called Al-Khaled and Kutom, both of whom said Mohammad did not need treatment in the cath lab. The third EKG occurred after Mohammad was admitted to the telemetry floor, and showed a STEMI, leading to Al-Khaled's treatment of Mohammad in the cath lab.

¶ 5    Plaintiffs' claims revolve around the contention that defendants violated the standard of care by not diagnosing him with a STEMI earlier than they did, and this lost time caused him to suffer avoidable levels of heart damage, which had significant lingering effects on his mental and physical health.

¶ 6                                    BACKGROUND

---

[1] The alleged relationships between certain defendants and corresponding entities also named as defendants in plaintiffs' complaint, as displayed in the caption, are not at issue in this appeal. Defendants Vinita Singh, M.D. and Natalia Szaflasrki, D.O., were dismissed before trial.

¶ 7    Plaintiffs filed their complaint on August 29, 2016, alleging Al-Khaled and Kutom both negligently failed to diagnose him with an "acute myocardial infarction" after the first two EKGs, failed to "perform or recommend *** immediate percutaneous coronary intervention in order to timely re-open his occluded left anterior descending artery," and failed to order "more frequent testing." Regarding the ER doctors, plaintiffs alleged they failed to recognize or diagnose Mohammad's condition properly, and that Motzny failed to explain Mohammad's condition properly to Al-Khaled.

¶ 8    In plaintiffs' response to defendants' interrogatories pursuant to Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018), they disclosed the opinions and anticipated testimony of retained cardiology expert Dr. Samuel J. Shubrooks, an associate professor at Harvard Medical School. Shubrooks' disclosure, in relevant part, stated, "the standard of care required Dr. Al-Khaled to take Mr. Salamah to the Cardiac Catheterization laboratory for immediate procedures to re-establish the coronary circulation." In Shubrooks' opinion, the first two EKGs showed Mohammad "was suffering an acute myocardial infarction." The disclosure continued, "Dr. Al-Khaled further violated the standard of care when he did not advise the emergency room physician to obtain more frequent electrocardiogram studies, more frequent troponin (another STEMI indicator) testing, immediate medical treatment of Mr. Salamah's acute coronary syndrome, and admission to a critical care unit for close monitoring." Shubrooks disclosed similar criticisms of Kutom's treatment. On causation, the disclosure stated, "Dr. Shubrooks is expected to testify that had the standard of care been met by Drs. Al-Khaled and Kutom, as described above, Mr. Salamah's [cath lab treatment] should have started by" 11:30 p.m., instead of approximately 3 a.m., and Mohammad "would have suffered minimal, if any permanent cardiac damage as a result of his November 2, 2014 acute myocardial infarction."

¶ 9 The disclosure continued that a reasonable on-call interventional cardiologist would have arrived within 45 minutes had an "emergency department physician" requested, "especially *** if Mr. Salamah's symptoms were not responding to appropriate medical management of IV nitroglycerin, beta blockade and heparinization (hereinafter, collectively, "the three medications")." It further stated, "Dr. Shubrooks is aware of the criticisms of the emergency department physician care and nursing care, as detailed in these disclosures, and assuming that those criticisms are true, Dr. Shubrooks is expected to testify that those violations of the standard of care were a proximate cause of Mr. Salamah's harms and losses."

¶ 10 Plaintiffs also disclosed the opinions and anticipated testimony of retained expert Dr. David S. Glaser, an emergency medicine expert. Glaser was expected to testify that Motzny and Bammon violated the standard of care because they should have known Mohammad was suffering from ACS, which "required them to begin aggressive medical treatment of that pain with Nitroglycerin IV drip, beta blockade and heparinization." The "failure to begin this medical regimen was a violation of the standard of care. Further, Dr. Glaser is expected to testify that he believes that this aggressive medical regimen would not have relieved Mr. Salamah's chest pain." Glaser's opinions also included that "the emergency room physicians should have called the Interventional Cardiologist again after the aggressive medical regimen, described above, failed to relieve Mr. Salamah's pain. That fact, coupled with the patient's presentation and changing EKGs provide an additional indication for taking Mr. Salamah to the Cardiac Catheterization laboratory emergently." Moreover, "the emergency room physicians also violated the standard of care by failing to obtain serial EKGs."

¶ 11 At Al-Khaled's discovery deposition, he testified that based on the first two EKGs, he concluded Mohammad "did not have the requirement to indicate" he was suffering a STEMI, and

thus did not need to go to the cath lab. He agreed one of the reasons Mohammad did not need to go to the cath lab was Al-Khaled's understanding, based on his conversation with Motzny, that Mohammad's chest pain was inconsistent. He explained, "[t]he two criteria that drove the decision at that time not to go are the clinical criteria and the ancillary distant criteria, which is usually the description of the pain." After his consultation with Motzny, they agreed "the chest pain and the findings on the electrocardiogram are not indicative of an ST-segment elevation myocardial infarction to take the patient to the cardiac catheterization lab."

¶ 12    At Motzny's discovery deposition, he testified that the first EKG did not show significant elevation changes. A significant elevation is "greater than one box" in limb leads and "greater than two boxes in the precordial leads." Regarding specific elevation levels, he testified the first EKG showed "There could be a one-box elevation in [precordial] lead V2." In the second EKG, there were higher levels in two precordial leads, but not enough to show a STEMI. He explained, "There are still no ST elevations in the limb leads. I do not see more than one box ST elevation in any other leads," and responded to the question, "Is the ST elevation you have described for us in Leads V2 and V3 sufficient to call for a STEMI alert[?]" with "As there are not two in two continuous leads, no, there is not; but I immediately called the interventionalist [Al-Khaled] anyway, in essence, calling a code STEMI." He agreed he did not actually call a code STEMI because "there is not an ST elevation MI on the EKG."

¶ 13    During his call with Al-Khaled, Motzny "discussed the EKGs, which he had, and my concern there was – the initial EKG was nonspecific, but that the second one was becoming more concerning. I discussed the fact that the patient did have chest pain but also had reproducible chest wall tenderness. And then we discussed --- I discussed the fact that given the increasing ST segments would he want to come in and take the patient to the cath lab, as he has persistent pain."

6

He never told Al-Khaled that Mohammad's pain went away for a period. Al-Khaled responded that he was not going to take Mohammad to the cath lab. Motzny told Al-Khaled he was going to call Kutom "to see if somebody else might be willing to come in and do a catheterization." He also told Al-Khaled "because of the severity of the pain that was going into his back, I could look for a thoracic aortic dissection. And he said, go—that sounds good. We can go through with them." He described the aortic dissection as "somewhat unlikely." Motzny decided to admit Mohammad to the hospital before he ended his shift that night and instructed Bamman to ensure that happened.

¶ 14    Motzny then contacted Kutom, who also decided not to take Mohammad to the cath lab. This was the first time Motzny contacted two cardiologists while treating a patient, so he did not think it was appropriate "within reason" to contact yet another cardiologist after Kutom decided Mohammad did not need catheterization. Motzny contacted Kutom because "there were EKG changes that were concerning to me."

¶ 15    At Shubrooks's discovery deposition, he testified that the 10:21 p.m. EKG showed evidence of infarction. He agreed that as of 10:21 p.m., neither IV nitroglycerin, IV heparin, or beta blockers would have relieved the obstruction in Mohammad's left anterior coronary artery. Shubrooks responded to the question, "Performing additional EKGs after 10:30 p.m. would not have impacted the outcome in this case because EKGs don't treat a condition, true?" with "further [EKGs] might have convinced" Al-Khaled that Mohammad's condition "warranted intervention."

¶ 16    During the deposition, the following exchange occurred:

"Q: Would it also be true that if Mr. Salamah had been given IV nitrogen—IV nitroglycerine drip after 22:21, that he would have still continued to have the severe, unrelenting chest pain that he experienced?
A: Yes.
Q: That the nitroglycerin would not have reduced his pain?
A: Correct.
Q: If he was given beta blocker, the same would be true?
A: Yes.

Q: And if he was given heparin, the same would be true?
A: Yes. Heparin is always reasonable to give, but it would not have taken care of the pain.
Q: All right. So, is it fair to say that had those measures been taken, repeat [EKG], that it would have provided more evidence for healthcare providers to determine that a STEMI was occurring, true?
A: True.
Q: If nitroglycerin had been given and had not provided chest pain relief, that would have been more evidence for the healthcare providers to determine that a STEMI was occurring?
A: Correct.
Q: If he had been given beta blockers and it was not reducing the chest pain or other symptoms, that would have been more evidence for the healthcare providers to correctly diagnose the STEMI?
A: Correct.
Q: And the same was true for heparin?
A: Yes."

¶ 17 Later in the deposition, he said it would take a "long time" to determine if heparin was relieving a patient's chest pain, including longer than an hour. There was no time-related response to beta blockers. On IV nitroglycerine, the following exchange occurred:

"Q: How long would you have to administer nitroglycerin IV before you can determine that it was ineffective in relieving the patient's complaints of chest pain?
A: If IV nitroglycerin is going to work, it should work fairly promptly. But again, in a situation like this with an infarct, it's not going to improve chest pain so you wouldn't wait for it.
Q: And how long would you have to give a test of IV nitroglycerin before you made the determination it was not effective? 15 minutes? 20 minutes?
A: If the whole decision was based on whether the chest pain went away with nitroglycerin, I'd say yes, 15, 20 minutes; but you wouldn't wait that long for it."

¶ 18 At Glaser's discovery deposition, he testified that the three medications should have been administered "right after they found the patient wasn't going to go emergently to the cath lab." He continued "in addition to the medical management, repeat EKGs while still in the emergency department or continued ST-segment elevation monitoring might have helped compel the interventionalist to come in." The next EKG should have occurred within 15 to 30 minutes of the 10:21 p.m. EKG. The "foundation" of his criticism of Motzny and Bamman was their failure to administer the three medications.

¶ 19    Pursuant to motions *in limine*, the circuit court barred plaintiffs from introducing testimony respecting the three medications at trial. During argument on the motions on December 6, 2022, plaintiffs' counsel argued that Shubrooks would testify that the failure to administer the three medications caused a delay in the STEMI diagnosis, and it is that delay that caused Mohammad harm, specifying that Shubrooks would testify the ER doctors should have administered "the drugs, and what you're going to find is they're not going to work. And that's what the emergency room doctor expert says, well, these things aren't going to work. And that information along with the repeat EKGs and the troponin will cause the interventional cardiologist to finally take him to the cath lab and give the therapy that he needs to clear up the heart attack." The court asked, "What does your expert say if they had given him Heparin, nitroglycerin, beta blockers, when should they have known and what would it have done? [Counsel for Kutom] is saying that he needed to be there within an hour and nothing else mattered." It continued, "But let's assume they gave him the medication. They would have learned or seen something happen to him, then what would they have done? How would he have been better if they had discovered it at that point in time?" Counsel for Kutom argued, "[T]here is no expert testimony that if these medications and these tests had been done it would have caused an interventional cardiologist to then change their mind and bring the guy to the cath lab. It's not there. There's your gap, okay, flat out."

¶ 20    The circuit court held ruling until the following day, December 7, 2022, where it barred the testimony following further argument. In so ruling, the court indicated it had read the relevant depositions and disclosures, and concluded, "it's implied, but your expert's not saying if they would have given him the beta-blockers within 20 minutes, they would have known this, and he would have been in the cardiac lab. It's the same for all of them. *** So, while he indicates it

would be reasonable to do – I think are his words—he doesn't say it would have gotten him to the cath lab sooner. And your 213s do not tie it up."

¶ 21    In another pretrial ruling, the circuit court denied defendants' motions to bar testimony regarding whether the ER doctors should have ordered a third EKG.

¶ 22    At trial, Mohammad testified that when he arrived at the hospital, he immediately reported that he had chest pain radiating to his left arm and that he recently had a heart stent procedure two weeks prior. He was "screaming" due to the pain. Mohammad also testified about the activities he enjoyed before November 2014, which his heart attack now prevented him from doing. On cross-examination, he testified he started "throwing up and sweating more" when he moved to the telemetry floor, but the pain did not change.

¶ 23    Motzny testified as an adverse witness that he first treated Mohammad at approximately 10 p.m. on November 2, 2014. Mohammad presented with severe left-sided chest pain and had a history of chest pain and heart issues, including the placement of stents two weeks earlier. Motzny knew that recently placed stents could clog. Mohammad had two EKGs during his treatment at Advocate, the first of which occurred at 9:47 p.m. Plaintiffs' counsel asked Motzny about the results of the 9:47 EKG, including the following exchange:

> "Q: So, it's your testimony that there could be a one-box elevation in the ST segment in V2 on this EKG of 2147, 9:47 at night?
> A: No, I specifically said there was not one box. I said less than one box."

Plaintiffs' counsel then read a portion of Motzny's deposition testimony where he testified, "There could be a one-box elevation in Lead V2," and Motzny agreed that he so testified at his deposition.

¶ 24    Motzny ordered a second EKG for Mohammad due to his pain. The EKG showed additional elevation of the ST segment. Motzny faxed both EKGs to Al-Khaled, then called Al-Khaled and asked if he would come in to take Mohammad to the cath lab. Motzny relayed his concerns about

the second EKG, and informed Al-Khaled that Mohammad had persistent chest pain. Motzny explained that the phone call concluded after the doctors discussed that "the EKG that did not show an ST elevation of MI of greater than two boxes, we reviewed the indications for it and agreed that there was no emergent requirement for catheterization."

¶ 25 Motzny told Al-Khaled he was going to call Kutom. It would have been "unprofessional" for Motzny not to, as Kutom was not just a cardiologist, but also Mohammad's primary care physician. Motzny answered, "is the reason you contacted a second cardiologist to take Mr. Salamah to the cath lab is because the EKGs were concerning to you?" with "The reason I called the second cardiologist was because it was Dr. Kutom, who was the patients' primary care physician. He happened to be a cardiologist." Plaintiffs' counsel then read a portion of Motzny's deposition in which he explained he contacted Dr. Kutom "Because I believe it was, one, because there was EKG changes that were concerning to me. *** I was given the availability of an extra cardiologist to discuss with." Kutom concluded, after reviewing both EKGs, that "a cardiac cath" was not "indicated." Motzny did not ask Kutom to take Mohammad to the cath lab because he did not believe Kutom had the necessary admitting privileges.

¶ 26 After Motzny's conversations with the cardiologists, he ordered a "CT angiogram" to rule out "the strong [possibility]" of aortic dissection before admission to the telemetry floor. Al-Khaled did not inform Motzny of any other treatment or orders to give Mohammad. Motzny did not order a third EKG because it was "not indicated."

¶ 27 Outside the presence of the jury, plaintiffs' counsel moved to strike certain portions of Motzny's testimony, complaining he had testified to undisclosed opinions, including that catheterization was not necessary. The circuit court denied the motion, stating, "[Rule] 213 does not apply in cross."

¶ 28   Al-Khaled testified, also as an adverse witness, that he was working as Advocate's on-call interventional cardiologist on November 2 and 3, 2014. His first involvement with Mohammad's care was when Motzny called him between 10:30 and 11 p.m. Al-Khaled testified in response to the question, "Well, Dr. Motzny told you that there were times that Mr. Salamah was pain-free or his pain was low intensity during his phone call, correct?" with "If I mentioned that in my deposition, I made a mistake. When I reconstructed the sequence of events, I might have mixed them up." Plaintiffs' counsel then read from Al-Khaled's deposition testimony, in which he relayed that Motzny told him Mohammad's pain was "on and off." Al-Khaled agreed that was his deposition testimony, but reiterated he was mistaken at the deposition. He chose not to take Mohammad to the cath lab because, "he did not have enough of a criteria on the electrocardiogram to meet what's recommend by the American College of Cardiology and the American Heart Association guidelines of EKG to take him." He said the information about Mohammad's pain level was "ancillary" to the decision, and the "gold standard" consideration, the EKG results, were the primary bases for his decision. He acknowledged that, at his deposition, he testified the pain level was one reason he decided against catheterization.

¶ 29   After the third EKG showed a STEMI early on November 3, 2014, Al-Khaled treated Mohammad in the cath lab. He reestablished blood flow at about 3:22 a.m. At that point, Mohammad was no longer experiencing myocardial infarction.

¶ 30   On direct examination by his attorney, Al-Khaled testified that after the phone call, he "agreed with Dr. Motzny" that Mohammad did not need to go to the cath lab. When he treated Mohammad in the cath lab on the morning of November 3, he found a clot or "stent thrombosis" in Mohammad's left anterior descending artery. The clot was soft, indicating it was fresh and had likely formed within the hour.

¶ 31    Kutom testified as an adverse witness that he started treating Mohammad in June 2009 and provided him with cardiovascular care for the next five years, including a cardiac catheterization in December 2010. When Mohammad had stents placed on October 17, 2014, medical providers at Palos Hospital called Kutom to inform him.

¶ 32    On cross-examination, Kutom testified that during his call with Motzny on November 2, 2014, Motzny told him, "I have your patient, Mr. Salamah here in the emergency room. He came in because of chest pain, and we were working him up, we did the EKGs. We called the interventional cardiologist, Dr. Al-Khaled, who was on call, and most likely he's going to be admitted. And that was it." Kutom reviewed Mohammad's two EKG results before the call, and agreed they did not show a STEMI. Motzny did not ask his input on Mohammad's care in the emergency room. Kutom did not believe the standard of care did not require Kutom to order more EKG testing.

¶ 33    Bamman testified as an adverse witness that he was working as a first-year resident under Motzny at Advocate on November 2, 2014. He was with Motzny while he cared for Mohammad. After they examined Mohammad, Bamman and Motzny had a concern for both aortic dissection and ACS. Mohammad was administered aspirin, sublingual nitroglycerine, and dilaudid, an opioid. Bamman's note after the second EKG stated the EKG was "concerning for interval changes." The changes were concerning for ischemia, but did "not indicate infarction." The next note, at 12:48 a.m. on November 3, indicated the CT angiogram was negative for dissection. This was the last time Bamman treated Mohammad. Bamman agreed Mohammad's pain level remained high throughout his time at the ER, which the nursing notes confirmed. Bamman had the authority to issue orders and testing for Mohammad.

¶ 34   On examination from his attorney, Bamman testified that as a first-year resident, he would not be responsible for Mohammad's care. Mohammad's troponin level was normal and indicated he had not suffered from a myocardial infarction at the point it was taken, at 10:40 p.m. Bamman did not order a third EKG because "There was no medical reason to think that had any significance," as Mohammad's condition had not changed, and repeat EKGs are ordered when there's been a change.

¶ 35   Navarette testified as an adverse witness that she worked in the Advocate ER beginning at 11 p.m. on November 2, 2014. She was a second-year resident at that time. Her usual practice was to receive a report on all patients in the ER when she began her shift, but she did not recall the report on Mohammad's condition, nor did she receive a history from him directly. In a treatment note, she described Mohammad's "EKG changes" as "dynamic but nonsensical." The note also indicated he was seen by cardiologists. She agreed that a 12:18 a.m. note from Chu indicated she told Navarette that Mohammad complained of severe chest and back pain and was "moaning in the cart."

¶ 36   Lillian Bush testified that she worked as a nurse on the telemetry floor at Advocate on November 3, 2014. She first encountered Mohammad at 1:23 a.m. He was visibly in pain and "making noises." Bush called Kutom, who ordered "nitro drip, the Dilaudid, and Zofran." Mohammad "was still in pain," so Bush "called the chest pain protocol" and an EKG was performed. The EKG showed a STEMI.

¶ 37   Shubrooks testified that he was an associate professor at Harvard Medical School. In his opinion, Kutom and Al-Khaled violated the standard of care because, "When Mr. Salamah came in, he had clear evidence that he was evolving a myocardial infarction. And in view of his overall situation, he needed to be taken promptly to the cath lab, and there was considerable delay before

he was." He testified that the second EKG showed Mohammad "was heading into" a STEMI, and further "the most important thing about the whole situation is, from the time he came into the hospital, he was having intractable, unresolved severe chest pain. So, my opinion is that he should have been taken to the cath lab after" the second EKG. Shubrooks continued, "The longer a coronary artery remains blocked ***, the move severe the damage is to the heart muscle." Before Shubrooks' testimony, the circuit court granted a defense motion to bar him from testifying that Al-Khaled should have requested a repeat EKG from the ER doctors. During Shubrooks' direct examination, the court sustained two objections to plaintiffs' counsel's attempts to elicit opinions regarding a third EKG.

¶ 38    Glaser testified that the ER doctors violated the standard of care by not ordering a third EKG within 15 to 30 minutes of the second EKG. In Glaser's opinion, a third EKG would have demonstrated Mohammad was suffering a STEMI. In support of this opinion, Glaser testified that while nothing on the 9:47 EKG was diagnostic, there were "concerning features," including "some degree of ST segment elevation." The ST elevation in box V2 was "just a little bit below" the required two millimeter threshold, while V3 was 1.75 boxes. Further indication that the ER doctors should have been concerned of a STEMI came from Mohammad's initial presentation to the ER, as he relayed his pain was similar to when he needed treatment for coronary artery disease in the past. The 10:21 EKG also showed ST segment elevation in V2 of "probably" two boxes, and again 1.75 boxes in V3. Glaser admitted, "I don't think [the second EKG] shows a STEMI."

¶ 39    On objection from defense counsel, the circuit court barred Glaser from testifying how a reasonable emergency doctor would have responded had an interventional cardiologist instructing them to conduct a third EKG. Plaintiffs' counsel argued the testimony should be admitted as a "logical corollary" to Glaser's disclosed opinion that had a nurse suggested to a reasonable

15

emergency doctor that a third EKG should be conducted, the ER doctor would have ordered it. During a sidebar on the issue, the court stated to defense counsel, "I don't think it's so prejudicial to you that the fact that if the cardiologist would have said that he would have ordered an EKG." Defense counsel for Kutom responded, "That's not the way this works that it's not so prejudicial. It is disclosed or it isn't disclosed, and he doesn't even need it." The court ultimately agreed, saying, "I can't take a corollary from one defendant to the next."

¶ 40    Rempson testified that she treated Mohammad from his arrival in the ER until 11:23 p.m., when Chu took over. On cross-examination by the attorney for Advocate, Rempson agreed that Advocate's chest pain protocol did not instruct nurses that if a patient continued to have chest pain complaints, the nurse should continue to order EKGs. She did not believe there was a reason she should have advocated for another EKG for Mohammad during her shift.

¶ 41    Plaintiffs' nursing expert Janet Jesiolowski testified that Chu and Rempson violated the standard of care by "not advocating for Mr. Salamah by going to the emergency room physician and asking about follow-up EKGs, which would be the standard procedure in regard to a patient like Mr. Salamah that was experiencing chest pain, classic symptoms of [ACS]." This was based on his clinical presentation and statements about his pain levels.

¶ 42    Salwa and other friends and family members, including their sons Odei and Eyad, Mohammad's brother Main, and Yasir Jaber, a former co-worker, testified as to their observations of Mohammad in the hospital during the incident and the lingering effects of the heart attack on Mohammad's physical and mental health.

¶ 43    Finally, plaintiffs called multiple expert witnesses to testify respecting damages, including a medical billing expert, a clinical psychologist that discussed Mohammad's "major depressive disorder," and a "physical medicine and rehabilitation" expert who opined that Mohammad was

permanently disabled. Amongst those witnesses was Ronald T. Smolarski, a "vocation evaluator, a functional capacity evaluator, [and] a life care planner and forensic economist," who prepared "evaluations" of Mohammad in connection with the case. Smolarski concluded that Mohammad was "disabled from competitive employment." As part of his evaluation, Smolarski calculated wage loss in connection with Mohammad's disability, but did not consider W2 federal income tax forms from 2011 to 2013, and instead calculated yearly income based on information from a database. Smolarski explained the calculation by stating, "Illinois is a wage capacity state."

¶ 44    Defense counsel objected to this testimony, which the circuit court sustained, instructing the jury, "I am going to strike the testimony that this is a wage capacity state, and I will instruct you as to the law." During cross-examination by the attorney for Advocate, however, the court *sua sponte* called for a break. When the jury exited, the court explained, "I am concerned about the fact that [Smolarski] has repeatedly said, 'why I can use the statistics I because Illinois is a wage capacity state.' He does not use those words in his deposition. It's not in his report. The way he explained it in his deposition was, oh, statistics are the best, because truck drivers have expenses, they deduct them and, all this kind of stuff that he has not said here. And so, I don't know what a wage capacity state is. It's not in the jury instructions, and I'm sorry, I do not get this, but I am sorry, I cannot let this go to the jury."

¶ 45    Plaintiffs' attorney asked the circuit court not to strike Smolarksi's lost wage testimony while he was on the stand, which the court refused. Counsel stated, "Well that's extremely—that is so prejudicial to us. It's not like this issue wasn't, you know, heard before and --," and the court replied, "I understand, but his testimony made it clear what he was relying on, which I did not get from the deposition, and I apologize, that his reports don't talk about that either. So, I made a mistake, and I apologize, but now that I heard his testimony, I can't let it go to the jury." When

17

trial resumed, the court instructed the jury, "I'm striking Mr. Smolarksi's economic damage report and assessment, which includes all the discussion about the lost wages and the benefits. So, you have to strike that, wipe it out of your mind, okay, and we'll proceed with what's left."

¶ 46    Each defendant called their own expert witness that testified each defendant's conduct was consistent with the standard of care in their respective fields. All four sets of defendants also introduced expert testimony that the first two EKGs did not indicate Mohammad was suffering a STEMI. Amongst the defense experts was Maureen Banathy, an "emergency department registered nurse," who testified as Advocate's expert on the standard of care in nursing. She testified that Rempson and Chu did not violate the standard of care in their treatment of Salamah, including not advocating for a third EKG. Physicians, not the nurses, interpret EKGs. Banathy summarized, "[T]he EKG is ordered by the physicians. So, the nurses were acting within their scope. They were frequently assessing the patient, reassessing, giving medicine, and updating the doctors on that status, and then the doctors are the ones who decide when that repeat EKG is done."

¶ 47    During closing arguments, plaintiffs' counsel argued that Motzny "changed his story where he just called Dr. Kutom to get admitting orders, not to advocate taking him to the cath lab, and that he agreed with Dr. Al-Khaled that the patient didn't need to go to the cath lab." Counsel also argued Al-Khaled changed his testimony about how Motzny described Mohammad's pain levels.

¶ 48    Counsel for Al-Khaled argued, in relevant part, "What caused the need for stenting in the first place? Well, there was one voice you heard early on in the case, almost a professor, Dr. Shubrooks. I've got to talk about almost a professor a minute. *** [T]here is somebody in this bunch of experts that you heard who spent 30 of his years as almost a professor *** and spent the next 30 years wishing, wanting, aching to be a professor. Never got it." Counsel continued, "How does that affect a person? Does that make them a happy camper or does that expose a little bit of

18

bitterness in being a doctor where he starts thinking, the medical profession, I don't care much about them," concluding that Shubrooks decided, "I will go around the country telling juries that doctors that they trust, doctors from their communities, they're not so smart. And he'll sneer and say, but I am Sam Shubrooks. I am an almost professor." Plaintiffs' counsel did not object.

¶ 49    Later in his closing argument, counsel for Al-Khaled stated regarding the verdict form, "And where it says 'Yes' or 'No' as to Dr. Al-Khaled, I'm going to ask you, if you get to that form, put 'No' by his name because 'No' means he doesn't deserve to pay this." Again, plaintiffs' counsel did not object.

¶ 50    Counsel for the ER doctors contended that the evidence did not demonstrate any deviations from the standard of care and that, if the jury disagreed with that, it should still rule in favor of the defendants because the plaintiffs failed to present causation evidence. Regarding Shubrooks, counsel stated, "Well, should that third EKG have been done? We've talked about that there's no evidence of what it would have shown. Dr. Shubrooks never testified what a third EKG would have shown."

¶ 51    Counsel for Advocate stated about Rempson and Chu, "These people are being accused of literally devastating this man's life." She continued, "we drag two human beings through this process, two nurses who literally had nothing to do with the management and the decision-making." On Chu specifically, counsel stated, "if you have the burden of proof, wouldn't you bring in that person and cross-examine them and ask them questions?" Counsel described Bush as "terrified" on the stand. She further suggested Shubrooks did not review the nurses' depositions, and that the presentation of plaintiffs' multiple damages experts was akin to "herding cats in an open field." Plaintiffs' counsel did not object to any of these comments. The circuit court noted

19

*sua sponte* during a sidebar that Advocate's counsel had "cross[ed] the line" by arguing plaintiffs failed to call Chu, "but no one objected to that one."

¶ 52   During jury instructions, the circuit court instructed the jury that, "Any statement or argument of an attorney that is not supported by the law or the evidence, you should disregard that statement or argument."

¶ 53   On December 21, 2022, the jury found in favor of each defendant. Plaintiffs did not pose special interrogatories to the jury. On January 12, 2023, the circuit court entered an order extending plaintiffs' deadline to file a posttrial motion to March 21, 2023, and on March 22, 2023, at 12:30 p.m., plaintiffs filed their posttrial motion. That same day, at 2:20 p.m., plaintiffs filed an emergency motion for leave to backdate the posttrial motion *nunc pro tunc* to March 21, 2023, arguing they had actually filed the motion before midnight on March 21, but it was subsequently "rejected" after midnight due to an "error with the Odyssey (the circuit court's e-filing) system," forcing the subsequent 12:30 p.m. filing the next day. Plaintiffs maintained the motion "was timely filed, other than the Odyssey system rejection," and thus the court could grant relief under Illinois Supreme Court Rule 9(d)(2) (eff. Sept. 1, 2024). They attached to the motion records from the Odyssey system suggesting the initial filing occurred on March 21 at 11:58 p.m., with additional exhibits stamped 12:10 a.m. on March 22. The court granted the motion.

¶ 54   On August 1, 2023, the circuit court denied plaintiffs' posttrial motion. Before addressing the merits, the court specified that it permitted the motion's filing *nunc pro tunc* to March 21, 2023, under Rule 9(d)(2)'s "good cause shown" exception, specifying that plaintiffs showed good cause because "the document that was ultimately accepted by the Clerk of Court through the Odyssey System was identical to the document which was rejected," and there was no "user error,"

as plaintiffs' counsel was not responsible for a "technical glitch" regarding the apparent error—an issue with the file format used by the court reporter for certain files. This appeal followed.

¶ 55                                      JURISDICTION

¶ 56    The circuit court denied plaintiffs' posttrial motion on August 1, 2023, and they filed their notice of appeal on August 22, 2023, within 30 days of the denial, which typically would provide jurisdiction according to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017).

¶ 57    This does not complete our jurisdiction analysis, however, as on this appeal, defendants contend the circuit court lacked jurisdiction to consider and grant plaintiffs' emergency motion to backdate their posttrial motion to March 21, citing *Dailey v. Amirante*, 2023 IL App (1st) 211609-U, ¶¶ 16-20 (discussing *Peraino v. County of Winnebago*, 2018 IL App (2d) 170368). Defendants maintain that when plaintiffs failed to successfully file their posttrial motion on March 21, the circuit court lost jurisdiction over the case. If we accept this premise, it means that in the absence of a timely posttrial motion, plaintiffs' notice of appeal to this court was due February 13, 2023 (30 days from the jury's verdict), making the August 22 notice untimely and thus depriving this court of jurisdiction. We review whether the circuit court had jurisdiction *de novo*. *In re Marriage of Arjmand*, 2024 IL 129155, ¶ 20.

¶ 58    Plaintiffs respond that the circuit court had the authority under Rule 9(d)(2) to *nunc pro tunc* the filing of the posttrial motion on good cause shown. Rule 9(d)(2) reads in relevant part, "If a document is rejected by the clerk and is therefore untimely, the filing party may seek appropriate relief from the court, upon good cause shown." Ill. S. Ct. R 9(d)(2) (eff. Sept. 1, 2024).[2]

---

[2] We acknowledge a new version of Rule 9(d)(2) was issued on May 21, 2025, which removes the good cause requirement. Ill. S. Ct. R. 9(d)(2) (eff. May 21, 2025). This update cannot be applied here, even

¶ 59   The record shows that plaintiffs filed their posttrial motion at 11:58 p.m on March 21, but the clerk rejected the filing due to the incompatibility of a file format for an attachment. The clerk accepted plaintiffs' posttrial motion the next day, when they also filed their emergency motion to date the posttrial motion *nunc pro tunc* to March 21. The court granted that motion, finding plaintiffs showed good cause.

¶ 60   We find the circuit court had jurisdiction to consider the merits of plaintiffs' emergency motion to date their posttrial motion *nunc pro tunc* to March 21, 2023. The key distinction between this situation and those at issue in *Dailey* and *Peraino* is that plaintiffs here filed the posttrial motion before the deadline expired. Although the clerk subsequently rejected the filing, thus making it untimely, this is the exact scenario contemplated by the express language of Rule 9(d)(2): "If a document is rejected by the clerk and is therefore untimely, the filing party may seek appropriate relief from the court, upon good cause shown." Ill. S. Ct. R. 9(d)(2) (eff. Sept. 1, 2024). Conversely, in *Dailey* and *Peraino*, the filing party did not file their document until after the midnight deadline expired. *Dailey*, 2023 IL App (1st) 211609-U, ¶¶ 16-20; *Peraino*, 2018 IL App (2d) 170368, ¶¶ 5, 24.

¶ 61   Defendants also contend that even if the circuit court had jurisdiction to consider the emergency motion, the court erred on the substance because plaintiffs failed to show good cause. We review a court's good cause determination under Rule 9(d) for an abuse of discretion. *Waukegan Hospitality Group, LLC v. Stretch's Sports Bar & Grill Corp.*, 2024 IL 129277, ¶ 15. Applying this standard, we find the defendants have set forth no substantive basis or authority to justify reversal. The court considered plaintiffs' explanation and determined it constituted grounds

---

if we determined the new rule generally applied retroactively, because trial proceedings are no longer "ongoing," as required for retroactive application. See *People v. Hunter*, 2017 IL 121306, ¶¶ 30-31.

for Rule 9(d)(2) relief because the rejection was caused by the electronic filing system, not an error by plaintiffs themselves. The record supports this conclusion, and defendants provide no argument as to why this explanation cannot constitute good cause, ending our role on review.

¶ 62    Defendants argue that plaintiffs (1) should not have waited until 11:58 p.m., (2) should have been more familiar with the e-filing system, and (3) the explanation that the error arose from a file format issue was "unclear." None of these arguments present grounds for reversal on abuse of discretion review, however, as there is nothing in the record to indicate the court did not sufficiently consider these issues. The circuit court chose to weigh the equities in plaintiffs' favor, and whether the defendants, this court, or another factfinder would have reached that same conclusion, is irrelevant to our consideration of whether the circuit court abused its discretion. See, e.g., *Daniels v. ArvinMeritor, Inc.*, 2019 IL App (1st) 190170, ¶ 36. Defendants are correct that some courts disfavor last-minute filings, and these courts may very well have held this against plaintiffs and ruled they could not show good cause. See *O'Gara v. O'Gara*, 2022 IL App (1st) 210013, ¶¶ 36-42. There is no rule, however, requiring that courts take this stance, and in this instance, the circuit court chose leniency in light of the court reporter's usage of a problematic filing format, and we will not substitute our judgment for that of the circuit court. See *Simmons v. Garces*, 198 Ill. 2d 541, 568 (2002). In the absence of binding authority holding this situation cannot constitute good cause, this court has no grounds to reverse.

¶ 63                                        ANALYSIS

¶ 64    On appeal, plaintiffs raise four claims: (1) the circuit court erred by barring their experts, per Rule 213, from testifying regarding the three medications; (2) the circuit court erred by denying the motion to bar certain trial testimony from Motzny which constituted undisclosed opinion in violation of Rule 213; (3) the attorneys for Al-Khaled, the ER doctors, and Advocate all made

improper remarks during closing arguments; and (4) the circuit court should not have stricken Smolarski's lost wage testimony. Plaintiffs also argue they deserve a new trial based on cumulative error.

¶ 65    Before reaching the substance of these claims, we must address defendants' contention that plaintiffs' claims are foreclosed by the general verdict rule. When the jury returns a general verdict in favor of a defendant and no special interrogatories are posed to the jury (as occurred here), a court on appeal must presume that the jury ruled in favor of the defendant on all contested issues raised. *Galich v. Advocate Health and Hospital Corp.*, 2024 IL App (1st) 230134, ¶ 41. Accordingly, we must presume in this case that the jury found in favor of each of the defendants on each contested element of the medical negligence claim against them, specifically breach of the standard of care and proximate cause, and on each theory for breach and causation plaintiffs advanced. See *Lazenby v. Mark's Construction, Inc.*, 236 Ill. 2d 83, 102 (2010). Any claim that only challenged one of the elements would necessarily fail because the jury's verdict could be affirmed on that claim independently based on the other, unchallenged element.

¶ 66    Despite this hurdle, we find we may address the substance of plaintiffs' claims. The Rule 213 claims both deal generally with evidence on whether it was a breach not to treat Mohammad in the cath lab earlier, and whether that delay caused him to suffer unnecessary damage to his heart. It follows that if we agreed that the circuit court erred in its evidentiary decisions and such error amounted to reversible error, it would defeat both breach and causation and thus entitle plaintiffs to a new trial. Similarly, the closing argument claim is that the arguments were so improper that they in and of themselves denied plaintiffs a fair trial, a theory they repeat about the court's decision to strike Smolarski's testimony in front of the jury, meaning if we agree with plaintiffs

on one or both of those theories, they would also be entitled to a new trial. See *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 94; *McDonnell v. McPartlin*, 192 Ill. 2d 505, 531 (2000).

¶ 67                    **I. Rule 213 Violation: The Three Medications**

¶ 68    Plaintiffs first claim the circuit court erred by barring testimony regarding the three medications. Specifically, they argue Glaser should have been permitted to testify that the standard of care for the ER doctors required them to administer the three medications once it was determined Mohammad was not going to the cath lab after the second EKG, and Shubrooks should have been permitted to testify that the failure to administer the three medications caused Mohammad to suffer more damage to his heart than would have otherwise occurred. Plaintiffs maintain that Shubrooks' testimony would have built off Glaser's opinion that the three medications would not have reduced Mohammad's pain, as that failure should have indicated to a reasonable cardiologist that Mohammad was suffering from a STEMI. The court barred the testimony because plaintiffs' Rule 213 disclosures, and the depositions of Shubrooks and Glaser, did not sufficiently disclose opinions that (1) the three medications would have failed within a specific timeframe, (2) the ER doctors would have diagnosed a STEMI based on these failures within a specific timeframe, or contacted Al-Khaled or Kutom, who would have diagnosed the STEMI themselves, and (3) this diagnosis would have led Mohammad to enter the cath lab earlier than he ultimately did, and suffer less damage accordingly.

¶ 69    Rule 213 states in relevant part,

"The information disclosed in an answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial. Information disclosed in a discovery deposition need not be later specifically identified in a Rule 213(f) answer, but, upon objection at trial, the burden is on the proponent of the witness

to prove the information was provided in a Rule 213(f) answer or in the discovery deposition." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018).

"Rule 213(g) limits expert opinions at trial to the information disclosed in answer to a Rule 213 interrogatory or in a discovery deposition," and the "disclosure requirements are mandatory and subject to strict compliance." *Tirado v. Slavin*, 2019 IL App (1st) 181705, ¶ 48. We review the circuit court's decision whether to admit expert testimony in response to Rule 213(g) disclosure objection for abuse of discretion. *Id.* ¶ 49. "A court abuses its discretion when no reasonable person would agree with the decision." *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 33.

¶ 70 The parties debated this issue extensively before trial began, with both sides pointing to aspects of the Rule 213 disclosures and depositions that supported their side. Plaintiffs' counsel pointed to Glaser's testimony that the IV-administered nitroglycerin should work within 15 to 20 minutes, and that Glaser expected the three medications (including the IV-administered nitroglycerin) to fail. Glaser argued these were sufficient disclosures to satisfy the court's timing concerns. This testimony, plaintiffs contended, alongside Shubrooks' deposition testimony that the failure of the three medications would constitute a further indication of a STEMI for a reasonable cardiologist, should have been enough for the court to admit the testimony. Conversely, the defendants argued that without more specific timing testimony, plaintiffs had not disclosed any opinion that the failure to administer the three medications would have caused Mohammad to go to the cath lab earlier than he did, meaning plaintiffs disclosed no testimony supporting causation as it related to this alleged breach.

¶ 71 We find the circuit court did not abuse its discretion in concluding plaintiffs did not sufficiently disclose the proffered testimony from Glaser and Shubrooks and thus excluding the testimony pursuant to Rule 213(g). Plaintiffs' primary argument, of course, is that the opinions

were sufficiently disclosed. They do not, and cannot, however, contend that the opinions they seek to admit were explicitly disclosed before trial. Below are the specific opinions plaintiffs contend the circuit court should have permitted:

(1) The ER doctors would have recognized that that the three medications failed by a particular time;

(2) After that recognition, the standard of care required a reasonable ER doctor to conclude that Mohammad was suffering a STEMI, or at least to call Al-Khaled to report the change, who himself should have diagnosed the STEMI based on his standard of care as a reasonable interventional cardiologist;

(3) At which point, the standard of care would also require Al-Khaled to open the cath lab, which;

(4) Would have caused Mohammad to enter the lab at a particular time, which;

(5) Would have saved Mohammad from a specific amount or level of damage to his heart.

This level of specificity is simply not present in the disclosures or deposition testimony of Glaser or Shubrooks. Without this specificity, the court could reasonably conclude Rule 213(g) required the court to exclude the opinions. See *Tirado*, 2019 IL App (1st) 181705, ¶ 49. The record therefore demonstrates that the court acted reasonably in resolving this dispute, meaning we have no basis to find that the court's decision making was arbitrary, based on something outside the record, or not one of the multiple potential conclusions one could draw from the record. See *Morrisoe v. Pantano*, 2016 IL App (1st) 143605, ¶ 48.

¶ 72    Plaintiffs also argue the circuit court erred by barring Shubrooks from testifying that Al-Khaled should have ordered a third EKG. The court based this ruling on the grounds that Glaser did not disclose an opinion that if an interventional cardiologist instructed a reasonable ER doctor

27

to perform the third EGK, the ER doctor would have done so. Plaintiffs claim the court erred because this opinion is a "logical corollary" to Glaser's disclosed opinion that had a nurse asked a reasonable ER doctor for a third EKG, the ER doctor would have ordered it.

¶ 73   This argument fails for the same reason the argument on the three medications failed—plaintiffs did not specifically disclose the opinion, and Glaser did not specifically testify to it at his deposition, and thus the circuit court acted within its discretion to exclude it under Rule 213(g). *Id.* While it is true that logical corollaries can be admitted under certain circumstances, whether such circumstances are present is an issue within the court's discretion. See *Foley v. Fletcher*, 361 Ill. App. 3d 39, 47 (2005). Here, the court decided the logical corollary principle did not apply because the nurses and cardiologists were distinct defendants, with distinct standards of care, and it was improper to extrapolate standard of care testimony from one to the other. Plaintiffs offer no argument on why this was an unreasonable conclusion.

¶ 74        **II. Rule 213 Violation: Undisclosed Opinion Testimony from Motzny**

¶ 75   Plaintiffs next claim the circuit court erred by permitting Motzny to testify at trial as follows: (1) he did not believe Mohammad was suffering a STEMI; (2) he agreed with Al-Khaled that Mohammad did not need to go the cath lab;  (3) he believed there was a "strong" possibility of aortic dissection and (4) he called Kutom as a courtesy, not because he wanted to see if Kutom could take Mohammad to the cath lab. Each of the above passages, according to plaintiffs, constitute undisclosed opinion testimony which the court should have struck pursuant to Rule 213(g).

¶ 76   Before addressing the substance of this claim, we must address defendants' argument that plaintiffs waived it by failing to object to the specific passages of testimony. The record shows that while plaintiffs' counsel did not object to any of these passages, counsel did protest admission

of Motzny's allegedly changed testimony by moving *in limine* to bar it, a motion the circuit court denied. While contemporaneous objections are mandatory for preservation in most instances, we agree with plaintiffs that when counsel raised the issue in its motion and the court ruled against them, this was sufficient to preserve the issue, and there was no need for plaintiffs' counsel to then object each time Motzny offered inconsistent testimony. See *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 33 (2010).

¶ 77    Turning to the substance of the claim, we find the circuit court did not abuse its discretion with respect to any of the complained-of testimony because the claims are predicated on a mischaracterization of the record. Plaintiffs' premise for this claim is that Motzny's opinion before trial was Mohammad's first two EKGs did in fact demonstrate he was suffering a STEMI, and Motzny therefore disagreed with Al-Khaled and Kutom when they decided against catheterization during Motzny's phone calls with each. Plaintiffs then point to Motzny's trial testimony that he believed no third EKG was necessary and he agreed with Al-Khaled and Kutom that Mohammad did not need to go to the cath lab as undisclosed "new" opinions, which run counter to his original opinion, as expressed at his deposition, that Mohammad was suffering a STEMI.

¶ 78    The record directly rebuts this characterization and shows Motzny never offered an opinion that Mohammad was suffering a STEMI. At his deposition, Motzny testified that he "in essence" called a "code STEMI" by initially contacting Al-Khaled. During this same section of deposition testimony, however, Motzny specifically clarified that Mohammad's EKG readings, in both of the initial two EKGs, did not satisfy the criteria for a STEMI, and thus Motzny never called an actual "code STEMI." This is conclusively supported by the undisputed fact that following his phone calls with Al-Khaled and Kutom, Motzny ordered a CT scan to check for aortic dissection, which occurred, and that Mohammad be admitted to the telemetry floor, which also occurred.

¶ 79  To account for this fundamental flaw in their premise, plaintiffs mischaracterize discrepancies in Motzny's recounting of facts at trial as new "opinions." Motzny certainly downplayed his concern level at trial, in comparison to what he expressed at his deposition, by characterizing his conversation with Al-Khaled as the two "agreeing" that Mohammad did not meet the STEMI criteria. Additionally, regarding the aortic dissection, Motzny did the converse, changing his description of the condition's potential from "somewhat unlikely" at the deposition to "strong" at trial. But these changes do not constitute undisclosed opinions, and the circuit court permitted Mohammad's attorney to handle the inconsistencies through impeachment with Motzny's deposition testimony. When a witness offers inconsistent testimony from deposition to trial, a proper method by which an attorney can hold that witness accountable is impeachment via deposition. See Ill. S. Ct. R. 212(a) (eff. Oct. 1, 2020). That is what occurred in this case, and we find the court did not err in resolving plaintiff's issues with Motzny's testimony in this fashion. We also note that, change in terminology aside, there is no meaningful discrepancy with respect to Motzny's testimony on aortic dissection. In both accounts, Motzny decided the CT angiogram was necessary to rule out aortic dissection after it was determined Mohammad was not going to the cath lab emergently.

¶ 80  The same resolution applies respecting Motzny's testimony on why he called Kutom. Motzny again downplayed his concerns as expressed at his deposition—he testified at his deposition that he called Kutom to see if another cardiologist thought Mohammad needed to go to the cath lab but stated at trial he only called Kutom as professional courtesy because he was Mohammad's primary care provider. Again, however, this is a discrepancy in a recounting of the facts, not testimony of an undisclosed opinion, and it was appropriately handled via impeachment with deposition. *Id.*

30

¶ 81    In support of their position, plaintiffs cite *Fakes v. Eloy*, 2014 IL App (4th) 121100, where the court found a Rule 213 violation constituted reversible error because a doctor offered an opinion as to a deceased's specific cause of death at his deposition, but at trial testified he did not know the cause of death. *Fakes*, 2014 IL App (4th) 121100, ¶¶ 67-68. It does not apply, however, because Motzny never offered an original opinion he later contradicted at trial. Again, we acknowledge that Motzny's deposition testimony contained inconsistent factual recounting of his concern level and motivations in contacting Al-Khaled and Kutom, but as to his *opinions* of Mohammad's condition, Motzny did not offer trial testimony that would invoke Rule 213 concerns. At both his deposition and at trial, Motzny consistently acknowledged Mohammad's first two EKG results did not meet the STEMI criteria, and that admission to the telemetry floor after testing for aortic dissection was the proper course of treatment.

¶ 82    We note that plaintiffs complain in passing in their opening brief that Al-Khaled also changed his testimony, specifically on what Motzny reported to him about Mohammad's pain level, and how that influenced Al-Khaled's decision making. To the extent this portion of the brief can be interpreted as a distinct claim, plaintiffs failed to support it with an argument and thus forfeited it. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Furthermore, even if plaintiffs had properly presented the issue, it would fail because the record shows that Al-Khaled did not offer substantively inconsistent testimony between his deposition and trial on this point, as he made clear at both proceedings that a patient's pain level was an "ancillary" criteria, with the EKG results being the primary consideration.

¶ 83                               **(3) Closing Arguments**

¶ 84    Plaintiffs next claim that the counsel for three separate defendants—Al-Khaled, the ER doctors, and Advocate—each made improper arguments at closing. Defendants first respond, and

plaintiffs concede, that they did not make timely objections to any of the complained-of argument. A contemporaneous objection to allegedly improper statements during a closing argument is a prerequisite to challenging those arguments on appeal, and having failed this requirement, we find plaintiffs have forfeited these claims. See *Vanderhoof*, 2015 IL App (1st) 132927, ¶ 94.

¶ 85    Forfeiture notwithstanding, plaintiffs are correct that an appellant may still be granted a new trial due to improper closing argument, despite not objecting at trial, if the argument was so prejudicial that it denied the appellant a fair trial. *Id.* Plaintiffs contend that the improper arguments discussed below each meet that standard. Attorneys have wide latitude at closing argument to comment on the evidence and draw inferences. *Ittersagen v. Advocate Health and Hospitals Corp.*, 2020 IL App (1st) 190778, ¶ 83. This latitude is not unlimited, however, as the argument must be based on the record (see *Wilson*, 2019 IL App (1st) 173065, ¶ 47) and should not "unfairly appeal to the [jury's] emotions." *Ittersagen*, 2020 IL App (1st) 190778, ¶ 83.

¶ 86    Plaintiffs' primary complaint over Al-Khaled's closing is defense counsel's characterization of Shubrooks as an embittered "almost professor" who, because he never became a full professor at Harvard, made a career of providing expert witness testimony against doctors. We find that nothing in the record supported this characterization, and as such it was argument not based on the evidence and technically improper. See *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 29 ("it is improper to make personal opinions of and unjustified attacks on the opposing party which are unsupported by the evidence"). We do not find that this argument was so inflammatory that it denied plaintiffs a fair trial, though, for two reasons: (1) the circuit court instructed the jury to disregard any argument from attorneys that was not supported by the record, and we must presume the jury did so absent indication to the contrary, which plaintiffs do not provide (see *Brooke Inns, Inc. v. S & R Hi-Fi and TV*, 249 Ill. App. 3d 1064, 1089 (1993)); and

(2) while impugning an expert's character may have some impact on the weight that a jury would give the expert, this emphasis on "associate" vs. "full" professor was so tangential to the core issues at stake in Mohammad's treatment that we cannot find it so impacted the whole of the proceedings so as to deny plaintiffs a fair trial. The defendants believed Shubrooks was not as qualified as their expert and made this point with myriad admissible evidence and proper argument. The contention that Al-Khaled's counsel went beyond the record to somewhat cartoonishly characterize Shubrooks could hardly be said to outweigh the literal days of technical medical testimony on which the jury based its decision, during which Shubrooks was contradicted not just by each expert called by the defendants, but also by Glaser, on whether the first two EKGs were diagnostic of a STEMI. This testimony, and the arguments based thereon, were far more potentially damaging to Shubrooks' credibility than any exaggerated bitterness about his job title.

¶ 87    Plaintiffs also argue that Al-Khaled's counsel's statement that Al-Khaled should not have to "pay" for the plaintiffs' alleged injuries constitutes an improper reference to potential monetary responsibility on Al-Khaled's part. See *Konewko v. Advocate Health and Hospitals Corp.*, 2020 IL App (2d) 190684, ¶ 91. This argument fails because the comment was not improper in context, as it can be understood as counsel contending Al-Khaled was not responsible for any heart injury Mohammad suffered because Al-Khaled's treatment was reasonable.

¶ 88    Plaintiffs next claim the attorney for the ER doctors improperly created facts not in the record by arguing there was no evidence supporting breach or causation. Generally, this is not an allegation of improper argument, as a defense attorney arguing a plaintiff has failed to prove the elements of a case is simply the function of defense attorneys. Within this broad argument, plaintiffs do point to a specific passage, arguing the ER doctors' counsel improperly contended there was no evidence of what a third EKG would show, highlighting that Shubrooks did not testify

33

on the subject. This argument fails because Glaser was permitted to testify that the third EKG would have shown a STEMI. The circuit court instructed the jury to ignore counsel's argument if it contradicted the record, and we must presume the jury did so absent indication to the contrary, which plaintiffs do not present. See *Brooke Inns*, 249 Ill. App. 3d at 1089.

¶ 89    Plaintiffs do raise viable issues, however, in their third and final closing argument claim, as the counsel for Advocate made improper comments on missing witnesses and the potential damage to Rempson's and Chu's reputations. First, counsel pointed to Chu's absence at trial with the implication that plaintiffs failed to call her to testify. This commentary on an absent witness not in plaintiffs' control was obviously improper, and the circuit court said as much during the argument. *Rutledge v. St. Anne's Hospital*, 230 Ill. App. 3d 786, 791 (1992) (citing *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 382 (1990)).

¶ 90    On this argument, however, we find plaintiffs fall short of demonstrating sufficient prejudice for a new trial. Chu's absence at trial is too tangential an issue in the case to find the commentary thereon had any effect on the verdict, and plaintiffs provide this court with no explanation as to how Chu's testimony would have significantly impacted the verdict such that a negative inference would be sufficiently prejudicial to require a new trial. See *Gillespie*, 135 Ill. 2d at 382-83 (no prejudice where "any speculation by the jury about the (missing witness') testimony would not have made any difference"). Whatever inference the jury may have made about Chu's testimony, it would not have added to the substantive consideration of the reasonableness of the conduct of Motzny, Al-Khaled, and Kutom in light of the first two EKGs.

¶ 91    The same issue applies to the other set of improper comments: counsel's repeated references to the harm a negative verdict would have on the nurses' reputations. Advocate counsel's commentary that the jury should consider the impact a negative verdict would have on the nurses

34

themselves, as people accused of ruining Mohammad's life, were improper and can constitute reversible error in appropriate situations. See *Konewko*, 2020 IL App 2d 190684, ¶ 90 (numerous improper comments made "in the context of a closely balanced case"). But this case does not present such a situation. Instead, this is an unpreserved error respecting argument about a tangential issue, and plaintiffs again fail to explain how such an error could create sufficiently serious prejudice against them that the entire trial must be discarded.[3] See *Kass v. Resurrection Medical Center*, 316 Ill. App. 3d 1108, 1114 (2000). Plaintiffs' citation to *Konewko* fails for this reason, as the case against the nurses was not close, particularly considering Banathy's essentially unrebutted testimony that interpretation of EKGs and making orders based on them, is the physicians' role. See *Konewko*, 2020 IL App (2d) 190684, ¶ 90.

¶ 92                     **(4) The Exclusion of Smolarski's Lost Wage Testimony**

¶ 93   Plaintiffs next claim the circuit court erred in two respects in excluding Smolarski's testimony: (1) the court erred substantively because the testimony was admissible, and (2) the court erred procedurally because it was prejudicial to exclude the testimony in front of the jury midway through Smolarski's live testimony. Both arguments fail. Regarding the first, we do not reach the issue because it relates to damages, and the jury found against plaintiffs on liability and thus never reached the damages element. *McDonnell*, 192 Ill. 2d at 531. Second, plaintiffs provide no substantive support from the record or citation to case law for the proposition that the court's decision to exclude one of Smolarski's opinions in the middle of his testimony was itself so inherently prejudicial that it infected the entire case, including the liability portion, and thus

---

[3]   Plaintiffs also complain of Advocate counsel's statements about "herding cats," whether Shubrooks read the nurses' depositions, and whether Bush was afraid on the stand. These arguments all fail for the same reasons; while technically improper, these are tangential issues and plaintiffs offer no explanation as to how the statements denied them a fair trial.

constitutes grounds for a new trial, and accordingly we do not substantively reach the argument. See *Toushin v. Ruggiero*, 2021 IL App (1st) 192171, ¶ 73 (appellate court "is not a depository into which a party may dump the burden of argument and research").

¶ 94                                   **(5) Cumulative Error**

¶ 95    Finally, plaintiffs argue that if we agree there were multiple errors below but conclude none were sufficiently prejudicial to require a new trial on their own, we should grant a new trial nonetheless because the cumulative effect of each error combined to deny them a fair trial. See *McDonnell*, 192 Ill. 2d at 536. This argument fails because, as explained above, the only errors plaintiffs have established consist of isolated moments of improper closing argument, each involving tangential issues. Given the nature of these errors, we do not find that their combination rendered the trial fundamentally unfair. See *Cetera*, 404 Ill. App. 3d at 47 ("Reviewing courts are not concerned that parties receive an error-free trial; rather, our concern is that plaintiffs receive a fair trial, one free of substantial prejudice."). We note that this conclusion would not change even if we reached the merits of plaintiffs' argument on the exclusion of Smolarksi's testimony, and resolved it in their favor, because the jury ruled against them on liability, negating any weight a substantive error on damages might have for cumulative error consideration.

¶ 96                                         CONCLUSION

¶ 97    For the reasons stated above, the jury's verdict is affirmed.

¶ 98    Affirmed.